886 So.2d 1085 (2004)
Albert J. AVENAL, Jr., et al.
v.
The STATE of Louisiana and The Department of Natural Resources.
No. 2003-C-3521.
Supreme Court of Louisiana.
October 19, 2004.
Rehearing Denied December 10, 2004.
*1087 Charles C. Foti, Jr., Attorney General, Burke & Mayer, Andrew C. Wilson, David L. Carrigee, Jedd S. Malish, Special Assistants to Attorney General, Counsel for Applicant.
St. Martin & Williams, Michael X. St. Martin, Joseph G. Jevic, III, Houma, Gauthier, Downing, Labarre, Dean & Sulzer, Charles S. Labarre, Cossich, Belle Chasse, Sumich & Parsiola, Ltd., Philip F. Cossich, Jr., McNabb & Associates, Carolyn A. McNabb, Houma, Counsel for Respondent.
Freddie Pitcher Jr., Thomas B. Calvert, Metairie, Professor Oliver A. Houck, Ruston, Panzeca & D'Angelo, Metairie, Salvadore Panzeca, Gregory G. D'Angelo, Oats & Hudson, William M. Hudson, III, Lafayette, Clifton O. Bingham, Jr., Baton Rouge, Lawrence E. Marino, Lafayette, *1088 Lawrence A. Durante, Debra C. Edlredge, James K. McCay, II, William J. Doran, Jr., Roland Dartez, Sherry S. Landry, City Attorney, Deborah M. Henson, Thomas A. Robichaux, Assistant City Attorneys, Pamela Miller Perkins, Baton Rouge, J. Michael Lamers, Michael W. Wascomb, Waltzer & Associates, Joel Waltzer, Harvey, Robert B. Wiygul, Liskow & Lewis, and Gene Lagitte, S. Gene Fendler, H.S. Bartlett, New Orleans, Frederick C. Whitrock, Baton Rouge, Donald E. Puckett, Counsel for Amicus Curiae.
VICTORY, J.[*]
In this case, oyster fishermen holding oyster leases in the Breton Sound area claim they suffered a compensable taking under La. Const. Art. I, § 4 as a result of the State of Louisiana's operation of the Caernarvon Freshwater Diversion Structure ("Caernarvon"), which altered salinity levels in the waters covering the oyster fishermen's leases. After a review of the record and the applicable law, we reverse the judgments of the lower courts and hold that the vast majority of the oyster fishermen are not entitled to compensation under La. Const. Art. I, § 4 because their leases contain clauses holding the State harmless from any loss or damage resulting from this coastal diversion project. Further, we hold that the claims of the oyster fishermen whose leases do not contain hold harmless clauses have prescribed under La. R.S. 9:5624.

FACTS AND PROCEDURAL HISTORY
Following the flood of 1927, the United States Army Corps of Engineers (the "Corps") expanded the Mississippi River levee system to confine the river to prevent further major floods. Before the levees were built, naturally occurring floods deposited millions of tons of sediments into the marshlands, which allowed marshland and other grasses to grow; without those nutrient-rich sediments, the plants that hold surrounding soils in place disappear and the land turns to open water. In the last fifty years, hundreds of square miles of wetlands along the Louisiana coast have disappeared and scientists have estimated that between thirty-five and forty-five square miles of coastal wetlands are lost each year.
Another effect of the levee system was on the salinity of the water. The coastal waters of Louisiana have historically provided excellent conditions for oyster growth, because the freshwater from the Mississippi River and smaller coastal streams mix with the saltwater of the Gulf of Mexico, creating an ideal ecosystem for oyster cultivation. By keeping fresh water out of the wetlands that surrounded the Mississippi River in the Breton Sound Basin, the levees unexpectedly raised the salinity of the waters covering those wetlands and this change in salinity fostered new oyster growth in the landward region of the basin that had previously been too fresh to sustain oyster growth. However, the changes in salinity that made some previously unproductive waters productive also ruined some oyster grounds that had been extremely productive before the levees were created.
These effects were recognized in the 1950s, and the state and federal governments began planning to divert freshwater from the Mississippi River into adjacent marshlands to address these problems. According to a 1959 memorandum issued by the U.S. Fish and Wildlife Service to the *1089 Corps, certain man-made and natural causes, over time, had increased the salinity level of the sub-delta marshlands below New Orleans, thereby adversely affecting fish and wildlife, including oysters, waterfowl, and fur animals. This investigation was prompted, in part, by requests from local groups, including the oyster industry, which attended a public hearing in New Orleans on April 25, 1955, concerning the need for freshwater diversions. After finding "a marked reduction [in oyster yield] per unit area" over time, the U.S. Fish and Wildlife Service concluded in the 1959 memorandum that "[i]ntroduction of fresh water to reestablish natural patterns of salinity and alluviation and increase fertility would provide the most effective method of restoring fish and wildlife production." The 1959 memorandum identified four separate areas in Plaquemines Parish as freshwater diversion sites, two of which were located on the west side of the Mississippi, Areas No. 1 and 3, and two on the east side, Areas 2 and 4. The diversion structures were to be designed to benefit both public seed grounds[1] and privately held water-bottom leases obtained from the state for oyster leasing. Between 1968 and 1969, the Corps met with local interests, including the Louisiana Department of Wildlife and Fisheries ("DWF") and the Plaquemines Parish Commission Council, to discuss proposed locations for the diversion structures authorized by Congress. During Corps-sponsored public hearings held in 1968, the Corps proposed Caernarvon as the situs of the freshwater diversion structure for Area No. 4 to be located on the east side of the Mississippi.
The 1959 memorandum described the entire area covering Area 4 as "usually too fresh to support an oyster industry ..." The memorandum stated that the pollution resulting from Caernarvon's discharge of silt would "not be a problem in Area No. 4 as in other areas because an oyster fishery is not present." Thus, the 1959 memorandum confirmed that Area No. 4, where Caernarvon would alter salinity levels in the water, coincided with the area of Breton Sound Basin that had been shown to be outside the productive oyster zone as of 1960.
During the 1970s, as land continued to erode and disappear further and further inshore, the zone favorable for oyster growth continued to move landward, due to saline changes. This landward salinity movement spawned an oyster community in the marshlands in the northwest portion of the Breton Sound Basin, which had previously been too fresh to sustain such growth. While creating new oyster grounds, the inland movement of salinity had the deleterious effect of rendering unusable large areas of previously productive oyster grounds, including the public seed grounds. Between 1978 and 1982, the Corps and relevant state and local agencies continued to discuss the construction of a freshwater diversion structure at Caernarvon at informal meetings. On January 21, 1982, the State submitted a letter to the Corps, announcing its intent to participate in the Caernarvon project, and the Corps and the Louisiana Department of Natural Resources (the "DNR") issued a joint public notice about the project.
*1090 In 1984, the Corps prepared an environmental impact statement suggesting locations of large salinity concentrations (isohalines) at three areas along the southeast Louisiana coast to enhance fisheries and to combat coastal erosion. To create optimal salinity regimes, the environmental impact statement proposed the construction of three freshwater diversion structures in the three areas: (1) the Bonnet Carre Spillway in the Lake Ponchartrain Basin; (2) the Davis Pond Freshwater Diversion Structure in the Barataria Basin; and (3) the Caernarvon Freshwater Diversion Structure in the Breton Basin near Braithwaite, Louisiana. The Caernarvon project, in particular, was designed to abate saltwater intrusion and marine tidal invasion, while promoting coastal restoration and enhancing fisheries and wildlife in the basin. The DNR and DWF set optimal target salinity zones in Breton Sound, which ranged from 5 parts per thousand ("ppt") for the northwest inland area of the basin to 15 ppt for the lower seaward end of the basin. The salinity zones were based upon the fact that below 5 ppt, oysters become stressed and die, while above 15 ppt, oysters are subject to saltwater predators and disease. The optimal salinity regime targeting annual average isohalines in concentration between 5 ppt and 15 ppt allowed oyster propagation and cultivation to continue in an existing zone within Breton Sound, while at the same time fostered coastal restoration by freshening the upper Breton Basin and allowing vegetation to return in an area where little oyster production was occurring. The Corps' 1984 memo also recognized that "the zone where conditions will become too fresh for oyster cultivation as a result of the diversion coincides with an area that was historically (prior to 1960) too fresh and not favorable for oyster cultivation." At a July 31, 1984, public hearing, the President of the Louisiana Oyster Dealers and Growers indicated his support for both the Caernarvon project and freshwater diversion structures generally.
On October 30, 1986, Congress authorized the funds for construction of Caernarvon, and the State entered into a formal cooperation agreement with the Corps on June 10, 1987. The agreement recognized Caernarvon as one of the four sites originally authorized by the Flood Control Act of 1965. In anticipation of the operation of Caernarvon, in 1989, DWF inserted a clause in its lease form, requiring that the State be indemnified and held harmless for any claims related to coastal restoration.[1a]
Also, in response to an October 26, 1990, letter from Bill Good, Ph.D., acting administrator of DNR's Coastal Restoration Division and chairman of the Caernarvon Interagency Advisory Committee (the "CIAC"),[2] to the acting secretary of the DWF, that oyster leases within the Caernarvon structure's intended impact area might be adversely affected by the freshwater diversion flow, the DWF implemented an oyster "relay" operation. The relay, known as the Caernarvon Oyster Transfer, allowed oyster lessees with productive oyster leases, who obtained a relay permit and posted a $1,000.00 performance bond, to move their oysters from the potential Caernarvon impact area to predesignated lease sites outside the impact zone.[3] Some *1091 lessees chose to participate, while others did not.
Construction commenced at the Caernarvon site on June 7, 1988, and was completed in February 1991. The official Caernarvon dedication was held on April 12, 1991. Caernarvon operates based on gravity and hydrostatic pressure from the river and consists of five culverts equipped with gates that can be raised or lowered to regulate the rate of flow from the river. Caernarvon was initially tested from an operational standpoint in August 1991, but could not be operated in accordance with its intended flow regime at that time since the entire Breton Sound area had been heavily impacted in early 1991 by heavy rains, resulting runoff, and the high river conditions which had overflowed the Mississippi's east bank directly into Breton Sound at the Bohemia Spillway. Caernarvon became operational in September of 1991 in accordance with the recommended flow rates, and this achieved some, but not all of the intended effects of the project. As a result, the CIAC eventually voted to significantly increase the flows of the Caernarvon project in 1993, resulting in a greater freshening of Breton Sound. While this greatly improved oyster production on the public seed grounds,[4] it reduced the salinity of the water covering the private oyster leases north of the public seed grounds and closer to the structure, where plaintiffs' leases are located. In 1996, the CIAC voted to decrease the flow to the original flow regime and has since monitored conditions, increasing or decreasing the flow in order to keep the annual average salinity within the 5ppt target area or isohaline (area of equal salinity concentration).
On March 29, 1994, plaintiffs filed the instant class action suit on behalf of all persons holding oyster leases on state-owned water bottoms in Breton Sound, asserting that their oyster leases were destroyed or damaged because of the intrusion of freshwater from the Mississippi River by the Caernarvon project. The plaintiffs' oyster leases are located in Breton Sound, east of Caernarvon and west of the public seed grounds; further east of the public seed grounds is the Gulf of Mexico.[5] There are approximately 204[6] *1092 oyster leases involved in this class action. Plaintiffs asserted that the State's action of lowering the salinity levels of the water in Breton Sound below that necessary to support oyster cultivation "has resulted in a permanent and substantial interference with plaintiffs' use and enjoyment of their land amounting to a taking of an interest in [their] property rights without compensation in violation of Article I, § 4 of the Louisiana Constitution ..." Plaintiffs asserted that prior to the time Caernarvon went on line, the 5-15 ppt salinity range coexisted with their leases.
On April 24, 1994, plaintiffs also filed suit in the United States Court of Federal Claims against the United States, more particularly the Corps, which designed, financed, and built Caernarvon, alleging the same takings theories, but under the Fifth Amendment to the United States Constitution. The Court of Federal Claims granted the Corps' motion for summary judgment in August of 1995, concluding that plaintiffs had no compensable expectancy in the continued artificially elevated saline levels caused by the Mississippi River levee system in historically freshwater marsh areas within Breton Sound. Avenal v. United States 33 Fed. Cl. 778 (1995). The court of appeal affirmed the decision on different grounds,[7] holding that the oyster lessees could not have had "reasonable investment-backed expectations" that their oyster leases would give them rights protected from the planned freshwater diversions authorized by the federal and state *1093 governments. Avenal v. United States, 100 F.3d 933 (Fed.Cir.1996).[8]
On December 15, 1998 in the state court suit, plaintiffs moved to strike all evidence, testimony, and argument regarding the hold harmless clauses contained in the oyster lease agreements. The DNR filed a motion for partial summary judgment seeking the dismissal of many class members' claims based on the validity of the hold harmless clause inserted into every lease agreement issued from 1989 through 1995. The DNR also argued in its motion for summary judgment that the Coastal Wetlands Restoration Advisory clause and the Allocation of Risk and Liability and Indemnity clause, both of which were inserted into every oyster lease agreement issued as of 1996, also precluded the plaintiffs' from asserting their claims for damages against the State. The trial court granted plaintiffs' motion in limine, excluding all evidence relating to the hold harmless provisions contained in plaintiffs' leases. The trial court deferred ruling on the DNR's motion for partial summary judgment as to the validity of the hold harmless clauses until "after the jury's findings." The DNR filed a writ application seeking review of these rulings, which the court of appeal denied in part and granted in part. Avenal v. State, 99-0317 (La.App. 4 Cir. 12/15/00). The court of appeal found no error in the trial court's grant of plaintiffs' motion in limine to exclude all evidence of the hold harmless provisions, but found that the trial court erred in deferring to rule on the motion for summary judgment and held that it had to either grant or deny the motion at least ten days before trial. Id. However, as this ruling from the court of appeal did not come until the final day of trial when the jury returned its verdict, the trial court never ruled on the motion for summary judgment regarding the validity of the hold harmless clauses.
Prior to trial, plaintiffs also filed a motion in limine to exclude all evidence and testimony regarding the biological assessments and side-scan sonar surveys that the DNR intended to use to prove the amount of reef on the individual plaintiffs' oyster leases. The trial court granted the motion. The trial court also refused to grant DNR's motion to compel production regarding the oyster lessees' actual income and production on their leases.[9]
After an eight-day jury trial on the merits, the jury returned a verdict in favor of the five class representatives, finding that "the state has taken actions which have taken or damaged the [plaintiffs'] right to property." The jury determined that $21,345.00 per damaged acre[10] would adequately *1094 compensate plaintiffs Duplessis, Skansi, Fox, and Fox Oyster Company for their losses, while $1,000.00 per acre would adequately compensate Avenal. The trial court, in accordance with the jury's verdict, rendered judgment awarding Avenal $826,000.00; Duplessis $5,442,975.00; Fox $20,235,060.00; Fox Oyster Company $16,200,885.00; and Skansi $5,571,045.00. The court awarded the remaining class members similarly situated to Avenal and those similarly situated to the four other class representatives their respective damages, which included 63,000 acres of oyster leases resulting in an award of over $1,000,000,000.00. In addition to compensatory damages, the court awarded plaintiffs attorneys' fees and court costs. The trial court denied all post-trial motions. The DNR filed an application for supervisory writs seeking review of the trial court's denial of its motion for new trial and its refusal to abide by the court of appeal's December 15, 2000 ruling that the trial court either grant or deny the motion for partial summary judgment on the hold harmless clauses at least ten days prior to trial. The court of appeal declined to exercise its supervisory jurisdiction, ruling that the DNR's writ application should be consolidated with its pending appeal. Avenal v. State, 01-0542 (La.App. 4 Cir. 5/22/01).
A divided five-judge panel affirmed the trial court judgment. Avenal v. State Dept. of Natural Resources, 01-0843 (La.App. 4 Cir. 10/15/03), 858 So.2d 697. Although the plaintiffs did not prove at trial the amount of oyster production on their leases before and after Caernarvon, and some leaseholders admitted that their leases had never produced oysters, the court of appeal held that "so long as plaintiffs proved generally that their leases were productive before [Caernarvon] came on line, and that they were not productive after [Caernarvon] came on line, and that [Caernarvon] caused the loss of oyster productivity ..." the plaintiffs were entitled to recover. Id. at 704 (emphasis added). In addition, the court of appeal increased the award to the lead plaintiff Avenal to over $17,000,000 because he is "a well-established oyster fisherman," and there was no proper basis for Avenal to be treated differently than the other plaintiffs, despite *1095 the fact that he had acquired some of his leases at the same time the present suit was filed. Id. at 703, n. 4.
We granted the DNR's writ application to determine whether plaintiffs are entitled to compensation under La. Const. Art. I, § 4 as a result of the State's operation of Caernarvon, which altered salinity levels in the waters covering the oyster fishermen's leases. Avenal v. State, 03-3521 (La.1/30/04), 864 So.2d 638.[11]

DISCUSSION

The Oyster Statutes
The leasing of state-owned water bottoms to private parties for the purpose of oyster farming is governed exclusively by a specific statutory scheme. According to this statutory scheme, the State owns "all oysters and other shellfish and parts thereof grown [on the State's water bottoms], either naturally or cultivated, and all oysters in the shells after they are caught and taken therefrom ... except as provided in R.S. 56:4."[12] La. R.S. 56:3. Further, the State owns all water bottoms "bordering on or connecting with the Gulf of Mexico within the territory or jurisdiction of the State," and the State may not alienate these water bottoms. La. R.S. 56:3; La. Const. art. VII, § 14 (2004); Art. IX, § 3 (2004). However, in order to foster, cultivate, and protect the Louisiana oyster industry, the State has statutorily authorized the issuance of oyster leases to private parties.
Accordingly, La. R.S. 41:1225 authorizes the DWF to grant leases on state-owned water bottoms for oyster cultivation, bedding, and harvesting, and matters relating thereto, as provided in Subpart D of Part VII of Chapter 1 of Title 56 of the Louisiana Revised States of 1950. La. R.S. 41:1225; La. R.S. 56:4. All oyster leases issued on State water bottoms are governed exclusively by this statutory scheme. La. R.S. 56:424. La. R.S. 56:425 provides that the Secretary of the DWF may only lease this State's water bottoms and natural reefs in the water bottoms of this State to a resident, a firm composed of residents, or a corporation domiciled in Louisiana or organized under this State's laws. The Secretary's right to grant oyster leases is likewise contingent upon a determination that the State owns the water bottoms to be leased, and that the lessee agrees as a matter of contract that he will operate under Louisiana laws and pursuant to DWF's rules and regulations. La. R.S. 56:425(A), (B). All leases begin on the date the lease is signed and continue for a fifteen-year period. La. R.S. 56:428(A). La. R.S. 56:425(C) recognizes that the Secretary may "make such stipulations in the leases made by him as he deems necessary and proper to develop the [oyster] industry" provided that the clauses are consistent *1096 with the statutory provisions of Subpart D.
The property rights of an oyster lessee are defined in La. R.S. 56:423 as follows:
A. A lessee shall enjoy the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon, subject to the restrictions and regulations of this subpart.
B. (1) A lessee of oyster beds or grounds who has obtained, recorded and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee.
* * *
(3) Any action for damages under this Section shall be brought within one year of the occurrence of the wrongful or negligent act, or within one year of the date of discovery of such act, whichever last occurs.
In exchange for this exclusive use of state resources, a lessee pays the State two dollars per acre for plots up to 2,500 acres (formerly 1,000 acres). La. R.S. 56:423(A); La. R.S. 56:432 (2003); Act 449 of 2003. The leaseholder can unilaterally terminate his lease at any time by notice or by simply ceasing rental payments. If the DWF unilaterally terminates a lease and takes it back to create new seed grounds, DWF must compensate the leaseholder but only for "oysters, seed oysters, and other improvements." La. R.S. 56:434(B) (1991). La. R.S. 56:428(A) also allows the State to forego giving an oyster lessee the first right of renewal under his lease upon a determination that the lease is not capable of supporting oyster populations.

The Hold Harmless Clauses
The vast majority of the leases in this case, except for 12[13] of the approximately 204 leases alleged by the named plaintiffs to have been "taken" by Caernarvon, contain hold harmless clauses which legally and validly hold the State harmless from any damages suffered by the oyster fishermen by the operation of this coastal diversion project. As explained below, we hold that the these oyster fishermen's takings claims are precluded by virtue of these hold harmless clauses.
In 1989, when DWF became concerned that Caernarvon would alter the salinity levels in the waters covering the oyster leases in Breton Sound, DNR objected to the issuance of oyster leases in Breton Sound or elsewhere in the vicinity of planned coastal restoration projects. However, a compromise was confected by then Chairman of the Louisiana Coastal Restoration Policy Committee, Manual Fernandez, to allow oyster leases to issue as long as they contained a hold harmless and indemnity clause in favor of the state. Thus, instead of not issuing any more leases on the basis that these leases would not be capable of supporting oyster populations under the authority of La. R.S. 56:428(A), DWF inserted a hold harmless clause into all leases issued after 1989, which cover 140 of the 204 leases in this case. It was only with this clause that the oyster leases were allowed to issue, which was solely for the benefit of the oyster *1097 industry. This 1989 hold harmless clause stated:
This lessee hereby agrees to hold and save the State of Louisiana, its agents or employees, free and harmless from any claims for loss or damages to rights arising under this lease, from diversions of fresh water or sediment, depositing of dredged or other materials or any other actions, taken for the purpose of management, preservation, enhancement, creation or restoration of coastal wetlands, water bottoms or related renewable resources; said damages to include, but not to be limited to, oyster mortality, oyster disease, damage to oyster beds or decreased oyster production, due to siltation, pollution or other causes.
All leases issued between 1989 and 1995 contain the same clause while leases issued from July 1995 to the present contain even more detailed indemnity clauses, namely the Coastal Wetlands Restoration Advisory Clause[14] and the Allocation of Risk and Liability, and Indemnity Clause.[15] *1098 These clauses were inserted into the leases given the fact that several suits had been filed as of 1995 by various oyster leaseholders alleging damages as a result of freshwater diversion structures (including this suit), and more were expected. These clauses were also in accordance with Legislative amendments in 1995 to the existing coastal restoration statutes requiring that the State be held harmless regarding coastal restoration in an effort to promote coastal restoration for the good of the public.[16]
All leases issued from July 1995 to present contain the Coastal Wetlands Advisory Clause and the Allocation of Risk and Liability and Indemnity Clause, which include 53 of the approximately 64 leases remaining in this case.
In spite of the undisputed fact that the language of the 1989 clause is clear on its face and explicitly releases the State from *1099 any liability to the oyster fishermen due to this diversion project, the court of appeal found that our prior decision in Jurisich v. Jenkins, 99-0076 (La.10/19/99), 749 So.2d 597, dictates the conclusion that the "unilateral insertion" of the 1989 hold harmless clauses are "legally invalid." 858 So.2d at 706. As to the post-1995 hold harmless clauses, the court of appeal recognized a 2000 statutory amendment that purportedly permitted the State to insert indemnity clauses into oyster leases, 2000 La. Acts No. 107, and that applied to oyster leases renewed or extended after July 1, 1995, but did not consider the validity of the post-1995 indemnity provisions because it found that none of the leases at issue in this case were dated after July 1, 1995.[17] These holdings are erroneous, as Jurisich does not compel the conclusion that the types of indemnity provisions in plaintiffs' leases are legally invalid, and the evidence presented clearly showed that 53 leases were renewed between 1996 and 1998 that contained the more detailed indemnity clause.
The issue in Jurisich was whether the DWF could refuse to renew oyster leases unless the oyster lessees agreed to the inclusion of a "navigation and oil field activity clause," which made the oyster leases "subservient to navigation, maintenance of navigation, and all normal, usual and permissible mineral and oil field activity which has been sanctioned by the State of Louisiana through a prior existing lease, permit, or contract." While the State had included other clauses in the leases at issue in that case, including the Coastal Wetlands Advisory Clause and the Allocation of Risk and Liability and Indemnity Clause, the Court expressly did not address the validity of these clauses. 749 So.2d at 599, 605 n. 8. Indeed, following an application for rehearing, this Court emphasized that "its discussion of the authority of the Secretary [of the DWF] and its ultimate holding were restricted to the inclusion of the navigation and oil field activity clause." Id. at 610. Accordingly, we expressly reserved the issue of whether that holding could be extended to other types of indemnity clauses, including in particular, the 1996 clauses at issue in this case.
Jurisich recognized that the statutory laws relative to the leasing of water bottoms for oyster production differ from the provisions that govern ordinary conventional leases addressed in Title IX of Book II of the Civil Code, La. C.C. arts. 2668, et seq. Jurisich, supra at 600 (citing Vujnovich v. Louisiana Wildlife and Fisheries Commission, 376 So.2d 330 (La.App. 4 Cir.1979)).[18] The Court found that the discretion the DWF has to renew an oyster lease *1100 is therefore limited by a determination of the lease's capability of supporting oyster populations under La. R.S. 56:428(A), and that legislative, or statutory, authority was necessary for an expansion of that authority. Id. at 601. The Court found that the legislative authority found in La. R.S. 56:425(C), which provides that "the [DWF] may make such stipulations in the leases made by him as he deems necessary and proper to develop the industry; however, these stipulations must be consistent with the provisions of this Subpart," did not grant the DWF authority to include the navigation and oil field activity clause.
One reason for this holding was the Court's finding that the State was obligated to give the oyster lessees the first right of renewal of their leases under La. R.S. 56:428(A), "provided the lease is capable of supporting oyster populations." As there was no showing that the lessees were incapable of supporting oyster populations, the State was found to have no right to fail to renew them by adding an onerous clause. This case is distinguishable from Jurisich as the State may very well have been able to show that the leases would become incapable of oyster production after Caernarvon became operational and could have refused to renew the leases on that basis. However, as discussed above, rather than do this, as a compromise the State inserted the hold harmless clauses in 1989.
Another reason for the Jurisich court's holding that La. R.S. 56:425(C) did not give the DWF the right to include the navigation and oil field activity clause in the lease was that the clause was not necessary and proper to develop the oyster industry as it abrogated the oyster lessees' rights under La. R.S. 56:423(B)(1) to sue third parties for negligent or wrongful injury to their leases.[19]Id. at 602-03. Therefore, La. R.S. 56:425(C) did not provide the DWF with the needed legislative authority to add the clause into the lease. The hold harmless clauses applicable in this case, on the other hand, contain stipulations that are necessary and proper to develop the oyster industry as a whole, as: (1) the clauses allowed oyster lessees, if they chose to continue to lease the property in spite of the coastal restoration efforts, to effectively risk that at some point the leases may be productive and to reap whatever other economic gains they could resulting from their status as lessees; (2) the clauses allowed the Caernarvon project to proceed without fear of economic disaster from lawsuits; (3) the Caernarvon project greatly improved oyster production on the public seed grounds; and (4) Caernarvon returned the area of productive oyster producing grounds to those which existed before the levee system began the coastal erosion process. The fact that certain leases became unproductive does not render the clauses unnecessary and improper for the development of the oyster industry. Further, unlike the situation in Jurisich, where the clause at issue was found to be invalid because it abrogated the lessees rights to sue third parties under La. R.S. 56:423(B), in this case, only the rights vis-a-vis the lessor and lessee are involved and the rights granted in La. R.S. 56:423(B) have never been recognized by this Court as anything other than rights granted against third parties to the leases, such as oil companies, not against the State.[20]
*1101 Finally, the Court in Jurisich rejected DWF's argument that the public trust doctrine allowed them to insert the clause into the leases. Id. at 604-06. La. Const. art. IX, § 1 provides, in pertinent part:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
The Jurisich court noted that this Court in Save Ourselves, Inc. v. Louisiana Environmental Control Com'n, 452 So.2d 1152, 1157 (La.1984), has interpreted that article as follows:
This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.
Id. at 604-605. In Jurisich, as the stipulated purpose of the clause at issue, i.e., to protect oil and gas companies from claims by oyster lessees was clearly not mandated by the public trust doctrine, the Court rejected the DWF's argument in that regard. Id. Further, as the Constitution vests primary responsibility for implementing the public trust in the State legislature, the clause could not stand because it was contrary to state legislation. The Court also specifically noted that "[i]n reaching this conclusion on the application of the public trust doctrine, we note that our determination is made in the context of the Secretary's duty to develop the oyster industry and is only made relative to the inclusion of the navigation and oil field activity clause, the only clause in the oyster lease now before us." Id. at 605 n. 8.
We find that the implementation of the Caernarvon coastal diversion project fits precisely within the public trust doctrine. The public resource at issue is our very coastline, the loss of which is occurring at an alarming rate. The risks involved are not just environmental, but involve the health, safety, and welfare of our people, as coastal erosion removes an important barrier between large populations and ever-threatening hurricanes and storms. Left unchecked, it will result in the loss of the very land on which Louisianians *1102 reside and work, not to mention the loss of businesses that rely on the coastal region as a transportation infrastructure vital to the region's industry and commerce. The State simply cannot allow coastal erosion to continue; the redistribution of existing productive oyster beds to other areas must be tolerated under the public trust doctrine in furtherance of this goal. See La. C.C. art. 450 and Comment (b) (stating that navigable water bodies are "public things that belong to the State," and that such property is "dedicated to public use, and held as a public trust, for public uses.")
For all of the above reasons, the decision in Jurisich is clearly distinguishable from the case at bar, and does not make the hold harmless clauses inserted in 193 of the approximately 204 leases as early as 1989 legally invalid. We find that they are legally valid and clearly enforceable under the authority granted the DWF in La. R.S. 56:425(C). No further legislative authority was needed to validate these indemnity clauses, and we therefore have no need to delve into the possible retroactivity of the subsequent statutes which mandate the inclusion of these clauses into oyster leases.[21] The claims covered by the leases that contained the 1989 indemnity clause are invalid, for either "takings" or damages, because these claims were filed in 1994 after these indemnity clauses were in effect. Likewise, the plaintiffs holding leases containing the more detailed indemnity clauses do not have valid takings or damage claims, even though this suit was filed in 1994 and these leases are dated July 1995 and later for the following reasons. First, it is under these leases that these plaintiffs claim their lease rights were taken by the State, as these were the leases offered into evidence by plaintiffs to prove their case. Second, these plaintiffs claim their leases were rendered permanently useless for commercial oyster production, which necessarily includes the time period covered by these post-1995 clauses. Had these plaintiffs claimed damage to their leases from the time Caernarvon began operation to the time they signed new leases with the post-1995 indemnity clauses, and had they alleged and proven specific monetary damages during this time period, they theoretically would have valid property damage claims. However, this was not the case they chose to make.
Thus, the named plaintiffs holding 192-193 of the approximately 204 leases in this case do not have valid takings claims because the indemnity clauses in their leases hold the state harmless from any and all claims for loss or damage to their rights under the leases caused by this *1103 coastal diversion project.[22] However, the named plaintiffs introduced into evidence 12 leases that are dated prior to 1989. Thus, because these lessees' takings claims are not precluded by virtue of any indemnity clauses, we must continue this analysis, which is applicable only to these remaining 12 leases.

The "Takings" Analysis
The Louisiana Constitution provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss....[23]
La. Const. art. I, § 4.[24] In Chambers, we recognized that "our constitution requires compensation even though the State has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose." 595 So.2d at 602.[25] *1104 This "inverse condemnation" action "provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced." Id. Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Art. I, § 4 of the Louisiana Constitution. "The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal." Id. (Cites omitted.) The constitutional command of Art. I, § 4 is self-executing, such that the cause of action arises whenever a state commits a taking without justly compensating the victim. Id.
Recognizing the abstract nature of the concept of the taking and damaging of legal property rights, the Court in Chambers set forth a three-prong analysis in determining whether a claimant is entitled to eminent domain compensation. Id. at 603. In accordance with this analysis, the court must: (1) determine if a recognized species of property right has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article I, § 4. Id.; Constance v. State Through Dept. of Transp. and Development Office of Highways, 626 So.2d 1151, 1157 (La.1993) (using C.C. arts. 667 and 668, which impose legal limitations on a landholder's right of ownership, to consider whether property was taken or damaged under Art. I, § 4).
Applying this judicially created framework to their claims, the plaintiffs claim a legal property right to their leased oyster beds, the oysters growing on them, and the future profits derived from those oysters. They claim that Caernarvon's changes to the salinity level of the waters covering those beds have damaged the beds' ability to cultivate oysters and, thereby, permanently deprived the harvesters of their rights to profits from oysters that would otherwise grow on those beds. They assert that Caernarvon's diversion of freshwater into the waters covering their oyster beds is in furtherance of the state purpose of preserving coastal wetlands. Because the State's action in furtherance of a public purpose damaged their property rights in the oyster beds and the profits generated by the oysters that grow upon them, they claim the State is required to compensate them for damages to those rights.
We find it unnecessary to conduct the full Chambers analysis, which seeks to determine whether a plaintiff is entitled to eminent domain compensation because his private property has been taken or damaged for public use. In this case, the relevant consideration is whether plaintiffs' property was "taken" for a public purpose, or whether it was "damaged" for a public purpose. A distinction between a taking and a damaging is necessary because of the existence of two relevant prescription statutes, La. R.S. 13:5111 and La. R.S. 9:5624. Section 5111 of Title 13 is entitled "Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription" and provides in pertinent part: "[A] proceeding brought against the state of Louisiana ... or other political subdivision..., for compensation for the taking of property by the defendant, other than through an expropriation proceeding, ... shall prescribe three years from the date of such taking." Section 5624 of Title *1105 9 provides: "When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works." Thus, although the Louisiana Constitution provides that just compensation shall be paid when property is taken or damaged, La. R.S. 13:5111 provides a three-year prescriptive period for takings and La. R.S. 9:5624 provides a two-year prescriptive period for damage. A.K. Roy, Inc. v. Board of Commissioners for Pontchartrain Levee District, 237 La. 541, 547-48, 111 So.2d 765, 767 (1959) (Prescriptive period of La. R.S. 9:5624 applies only when private property is damaged for public purposes, but not actions for recovery of private property taken for public purposes).
The distinction between a taking and a damage claim was made in a case in which a holder of a predial lease invoked property rights pursuant to the 1921 Constitution.[26]Columbia Gulf Transmission Co. v. Hoyt, 252 La. 921, 215 So.2d 114 (1968). In that case, the Court found the lessee's rights under a predial lease fell under the constitutional designation of "private property" in Art. I, § 2 of the 1921 Constitution and required just compensation to the lessee before the lease rights were damaged, even though Louisiana codal law classified a lessee's rights as personal rights.[27] However, as particularly relevant to this case, the Court distinguished the terms "taken" and "damaged" in Art. I, § 2. The Court stated that "property is `taken' when the public authority acquires the right of ownership or one of its recognized dismemberments." 215 So.2d at 120. "Property is considered `damaged' when the action of the public authority results in the diminution of the value of the property." Id.
In Hoyt, this Court stated that beginning in 1880, in the case of In Re Morgan R.R. & S.S. Co., 32 La. Ann. 371, and continuing, courts have awarded lessees compensation for leases in land expropriations, because when land subject to a lease is taken for public use, the lease terminates. This Court noted that lease rights, however, may be damaged other than by termination of the lease. If the land taking is partial only, such as in the acquisition of a servitude for passage, the taking *1106 may damage lease rights, although the lease has not been destroyed.
We have no trouble classifying this case as a "damage" case under Art. I, § 4 rather than a "takings" case, for numerous reasons. It is undisputed that the state owned and continues to own the water bottoms. La. R.S. 9:1101. The state owns the waters. Id. The state owns the oysters. La. R.S. 56:3. Thus, the State could not take its own property. As Judge Tobias aptly noted in dissent, "[t]he State cannot appropriate or inversely condemn that which it already owns." Avenal, 01-0843, 858 So.2d at 740 (Tobias, dissenting).
Further, the oyster fishermen's right of exclusive use of the water bottoms was not taken as, in spite of Caernarvon, no other private party can use these bottoms to fish for oysters. In addition, their exclusive right to oysters and cultch thereon was not taken as no other private party can enter that lease and extract oysters or cultch. The changes in salinity of the water resulting from Caernarvon affected neither of these rights. As one court commented, "[t]he plaintiffs retained the use of their leaseholds, it was not the plaintiffs who were ousted by [Caernarvon], but the oysters." Palm Beach Isles Associates v. U.S., 231 F.3d 1354, 1360 (Fed.Cir.2000) (explaining their holding in Avenal, supra, 100 F.3d 933).
Plaintiffs claim, however, that what was taken was their right to profitably harvest oysters from these waters because the salinity levels will prohibit this if Caernarvon is run at its full capacity as expected. Indeed, the court of appeal agreed and found that Caernarvon constituted a taking because it "rendered the plaintiffs' oyster leases permanently useless for commercial oyster production." Avenal, supra, 858 So.2d at 706. However, this somehow assumes that the State intended to guarantee each lessee a commercially viable oyster lease. La. R.S. 56:423 never mentions nor suggests that lessees are entitled to profits. Further, the oyster statutes do not guarantee the oyster lessees with a vested right to an optimal salinity regime in the State's own waters, nor that the state maintain a certain salinity regime favorable for oyster cultivation. As one commentator has stated, "[o]ne can hardly imagine why the state would charge only two dollars per acre if indeed the purchase of a lease automatically conferred a right to $21,000 or more per acre in expected profits upon all oyster lessees who attempt to harvest oysters on leased lands." Robert L. Rogers, III, Turning River Water into Gold: Why Oyster Harvesters should not be Permitted to Cash In On Changes in Salinity Caused by the Caernarvon Water Diversion Project, 22 Va. Envtr. L.J. 53, 72 (2003) (case note); see also Louisiana Seafood Management Council v. Louisiana Wildlife and Fisheries Com'n., 97-1367 (La.5/19/98), 715 So.2d 387, 392-92 (citing Andrus v. Allard, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("loss of future profits-unaccompanied by any physical property restriction-provides a slender reed upon which to rest a taking claim ... [T]he interest in anticipated gains has traditionally been viewed as less-compelling than other property-related interests."))
Further, the court of appeal's holding that Caernarvon rendered the plaintiffs' oyster leases permanently useless for commercial oyster production fails to take into account that, as to those 12 leases which did not contain indemnity clauses, they all expired between 2000 and 2005, at which time the they would either be renewed with the post-1995 hold harmless clause, or not renewed at all upon a finding by the State that the leases were incapable of supporting oyster population. At most, *1107 these plaintiffs with pre-1989 leases possibly had a claim for property damage up until the time these leases expired.
In addition, in this case, the class representatives testified that they continued to exercise their right to claim damages from oil and gas interests for drilling, surveying, dredging, and other exploration activities conducted on their leases following the diversion, even though the leases were unproductive for oysters. Several of the oyster lessees also filed claims with the federal government for the damages to their oyster leases as a result of Hurricane Andrew. Evidence was also presented at trial that some of the leases were still producing oysters. Thus, Caernarvon did not deprive the plaintiffs of all economically beneficial use of their property. However, it may have damaged their property rights in their oyster beds and the profits generated by the oysters that grow upon them.
For the above reasons, the rights under the remaining 12 leases may have been "damaged" under Art. I, § 4, but they have not been "taken."[28] Therefore, *1108 the prescriptive period of La. R.S. 9:5624 applies to these claims.

Prescription under La. R.S. 9:5624
La. R.S. 9:5624[29] provides as follows:
When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works.
The purpose of La. R.S. 9:5624 is to limit the exposure of the State and its political subdivisions to liability in connection with a public work to a reasonable period of time. Lyman v. Town of Sunset, 500 So.2d 390 (La.1987).[30] This Court has specified that "not every lawsuit for damages caused by a public entity or involving a public works project falls within the purview of R.S. 9:5624." Estate of Patout v. City of New Iberia, 98-0961 (La.7/7/99), 738 So.2d 544, 549. In order to fall under the statute, damage must be incurred "for public purposes." Id. Damage is incurred "for public purposes" when the damaging is "intentional or occurs as a *1109 necessary consequence of the public undertaking." Id. at 553. "[E]ven unintentional damage can be inflicted `for public purposes' if it is a `necessary consequence' of the public project." Id.
As explained by Judge Tobias in his dissent, plaintiffs' claims fall under La. R.S. 9:5624 because "it is undisputed that the damages sustained by the plaintiffs to their leasehold interest, in addition to the loss of their oyster crops and loss of anticipated income from those oysters, were a necessary consequence of the public work [Caernarvon] and incurred for a public purpose." 858 So.2d at 742 (Tobias, dissenting). "The construction and operation of the Caernarvon Freshwater Diversion Structure were mandated by the U.S. Congress and the State of Louisiana for the dual purposes of restoring the State's coast for hurricane and flood protection and enhancing oyster production on the State's public seed grounds." Id.
Caernarvon was completed and accepted in 1991. The record reflects that the official dedication ceremony of Caernarvon was held on April 12, 1991, it went online in September of 1991, the operational flow began at least by November 6, 1991, and the class representatives claimed their damages began to occur when Caernarvon began diverting freshwater in 1991.[31] Thus, all of the key dates for prescription purposes occurred in 1991.[32] Pursuant to La. R.S. 9:5624, the plaintiffs would have had to file their claim for damages no later than November 1993, at the latest, which was two years from the date the project began to divert freshwater. Because the plaintiffs' suit was not filed until March 29, 1994, any claims these oyster fishermen had for damages under La. R.S. 9:5624 are prescribed.[33]

CONCLUSION
The oyster fishermen are not entitled to compensation under La. Const. Art. I, § 4 by virtue of the operation of Caernarvon for several reasons. First, the vast majority of the leases at issue contained hold harmless and indemnity clauses which validly released the State from liability as a result of this coastal diversion project. Secondly, the property rights under the 12 leases not containing hold harmless clauses were not "taken" by virtue of Caernarvon under Art. I, § 4. To the extent that the any of the oyster fishermen's property rights under these remaining 12 leases *1110 were "damaged" under Art. I, § 4, these damage claims prescribed two years from the completion and acceptance of Caernarvon under La. R.S. 9:5624.

DECREE
For the reasons expressed herein, the judgments of the lower courts are reversed and plaintiffs' claims are dismissed.
REVERSED.
JOHNSON, J., concurs in result.
WEIMER, J., additionally concurs with reasons.
WEIMER, J., concurring.
The conflict in the instant case is between the rights of individuals and governmental actions which serve the public good. The importance of the outcome of this conflict makes the task of balancing these interests all the more arduous. I write to emphasize the importance of the oyster industry and the importance of the state's fight against coastal erosion to the future well-being of this state. Nevertheless, while acknowledging that individual rights must be respected and protected and that government must be allowed to take those actions which prevent calamity, ultimately, as judges, our role is to apply the law to the facts before us.
The oyster industry has been and continues to be vital to Louisiana's economy. As stated in A Brief History of the Louisiana Oyster Industry:
[C]ultivation of oysters has developed over the years into a partnership between the state and private oystermen through the use of both public seed grounds[[1]] and privately leased state water bottoms.
....
The leasing of water bottoms began in the 1850s when oystermen leased areas from the parishes. However, when the Louisiana Oyster Commission (predecessor to the Louisiana Department of Wildlife and Fisheries) was formed in 1902, oystermen began leasing water bottoms from the state.
....
The Louisiana oyster industry is one of the most successful oyster fisheries in the country.
Posted by the Louisiana Department of Wildlife and Fisheries, at http://www.wlf.state.la.us/apps/netgear/index.asp?cn=lawlf&pid=1084.
Oyster farming has historically been arduous, backbreaking work requiring a special dedication. Oyster farming is fraught with all the difficulties and risks farmers on land face  such as variances in weather conditions and pests  as well as those peculiar to aquaculture. Louisiana has historically leased water bottoms for a nominal value because this property had little intrinsic value. Through hard work and dedication, many oyster fishermen built reefs with materials referred to as cultch[2] over the muddy water bottoms, turning unproductive lands into an area producing bountiful crops of oysters. Conversion of this previously barren property into productive oyster-producing areas has spanned generations.
In addition to the leased acreage, market oysters from Louisiana's public seed grounds account for approximately one third of the annual harvest. Assane *1111 Diagne and Walter R. Keithly, Jr., The Demand for Relaying by the Louisiana Oyster Industry (2000), at http:// oregonstate.edu/dept/IIFET/2000/abstracts/keithly.html.
Estimates indicate state oyster production creates about 10,000 jobs and generates $266 million a year in Louisiana. During 2000, Louisiana produced approximately 10.22 million pounds of the 16.6 million pounds of oyster meat produced nationally  representing approximately 63 percent of the total United States oyster production. It is believed that Louisiana now produces over 70 percent of the total United States harvest. Agriculture Marketing Resource Center at http: //www.agmrc.org/aquaculture/oystermain.html. In sum, the oyster industry is a valuable economic asset of Louisiana. Oysters are a rich part of Louisiana's history, heritage, culture, cuisine, and folklore. Louisiana oysters are prized by chefs world-wide as a delicacy.
However, many historically productive areas are likely to be of little value in terms of their ability to produce significant quantities of oysters due to wetlands erosion and subsidence. The Demand for Relaying by the Louisiana Oyster Industry by Assane Diagne and Walter R. Keithly, Jr., supra. Thus, freshwater diversion, which is an integral part of coastal restoration,[3] is important to the viability of *1112 the oyster industry as a whole. A unique feature of this case is that although there may be loss by individuals on private leases caused by the freshwater diversion, losses may be offset by oyster production on public grounds, which the evidence established increased dramatically. Oyster productivity from the public seed grounds increased by 300 percent, a fact acknowledged by plaintiffs in brief.
Freshwater diversion became particularly important for the oyster industry after 1927 when the Mississippi River levee system was enhanced for navigation and flood prevention purposes. However, the construction of additional and larger levees prevented river water from reaching adjacent estuaries and the oyster beds located therein on both sides of the Mississippi River. Consequently, these areas continued to become more saline; the salinity killed the plant life that held the soil together. This, in turn, accelerated erosion, which was no longer being offset by the replenishing of land by suspended sediment from the river. As the land eroded, the saltwater intrusion from the Gulf of Mexico continued farther inland. In response, the oyster fishermen relocated their oyster beds farther inland away from encroaching saltwater predators and disease, but closer to the sources of manmade pollution.
Avenal v. State, Department of Natural Resources, 01-0843, pp. 2-3, (La.App. 4 Cir. 10/15/03), 858 So.2d 697, 710 (dissent by Judge Tobias).
I agree with the majority's detailed analysis of the plaintiffs' contracts that contain hold-harmless clauses. I also agree with the majority's discussion of prescription which applies to the remaining leases. A threshold consideration regarding prescription is a comparison of the property rights guarantee of the United States Constitution with the property rights guarantee of the Louisiana Constitution. The Fifth Amendment of the United States Constitution states in pertinent part: "No person shall be ... deprived of ... property, without due process of law; nor shall private property be taken for public use, without just compensation." (Emphasis supplied.) Article 1, Section 4 of the Louisiana Constitution of 1974 states in pertinent part: "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation." (Emphasis supplied.)
Generally, the language of the Fifth Amendment has been given a broad meaning, which results in a "taking" in the constitutional sense not only when there is *1113 a substitution of ownership but also when there is deprivation of ownership, including damage to, depreciation in value of, and destruction of property. 29A CJS Eminent Domain § 82 at 230 (1992). Likewise, in Louisiana, taking and damage claims are treated the same for most purposes, and it is seldom necessary to delineate between taking and damaging. See State, Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598, 603 (La.1992); Constance v. State, Department of Transportation and Development, Office of Highways, 626 So.2d 1151, 1156-1157 (La.1993). However, in cases where the differences between the two discrete rights specified in the Louisiana Constitution  proscription of the state's taking personal property without just compensation and proscription of the state's damaging personal property without just compensation  form the dispositive issue, we must give effect to the language of the Louisiana Constitution.
The term "taken" as used in the Fifth Amendment has been interpreted broadly to include some, but not all, damages to private property. When federal or state government limits the owner's use of private property, without itself occupying or otherwise using the property for government purposes, the classic analytical tool used by the federal courts for assessing whether a taking has occurred is the three-part test enunciated in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[4]Avenal v. United States, 100 F.3d 933, 937 (Fed.Cir.1996). The courts consider: "the character of the governmental action, the economic impact on the claimant and, particularly, the extent to which the governmental action has interfered with distinct investment-backed expectations." Id. Finding that these plaintiff oyster farmers did not have distinct investment-backed expectations, the federal appellate court rejected the argument that the Caernarvon Freshwater Diversion Structure (Caernarvon) resulted in a "taking" pursuant to the Fifth Amendment. Thus, the plaintiffs' claims were not compensable under the federal constitutional guarantee despite the broad interpretation accorded the word "taking" in the federal jurisprudence.[5]
In contrast, La. Const. art. I, § 4, using both words, "taken" and "damaged," encompasses damage claims that would not necessarily qualify as a taking under the Fifth Amendment. Under Louisiana law, a damage claim is compensable although it is not a taking. Although "damages" sustained as a result of public projects are potentially compensable under the Louisiana Constitution, not all claims that are compensable under federal law (because they are deemed to be "takings") are "takings" under Louisiana law.
In sum, because the Louisiana Constitution provides for compensation for property "taken" or "damaged," what is considered "taken" is a narrower concept in Louisiana when contrasted with federal law. Under federal law, interpretation of the term "taken" is broader. Under Louisiana law, the right to compensation is broad, but the interpretation of "taken" is narrower than in the federal sense. It would be incongruous for the identical governmental act for public purposes, the *1114 Caernarvon project, to meet the narrower interpretation of "taken" called for by the Louisiana Constitution but not to meet the broader interpretation of "taken" for Fifth Amendment purposes. See, Avenal, 100 F.3d 933. The fourth circuit's decision that the Caernarvon project was a taking pursuant to the Louisiana Constitution was erroneous. Avenal, 01-0843 at 11-12, 858 So.2d at 705-706.
Thus, although the Louisiana Constitution provides that just compensation shall be paid when property is taken or damaged, LSA-R.S. 13:5111 provides a three-year prescriptive period for takings and LSA-R.S. 9:5624 provides a two-year prescriptive period for damage.[6]A.K. Roy, Inc. v. Board of Commissioners for Pontchartrain Levee District, 237 La. 541, 547-548, 111 So.2d 765, 767 (1959) (Prescriptive period of LSA-R.S. 9:5624 applies only when private property is damaged, but not to actions for recovery of private property taken for public purposes.).
In the instant case, suit was filed on March 29, 1994, which was more than two years after the completion, acceptance, and initial operation of the Caernarvon project. Suit was filed less than three years from the date the plaintiffs contend a "taking" occurred, when the oyster beds were "rendered permanently non-usable" for the commercial production of oysters. See, Avenal v. State, Department of Natural Resources, 01-0843, p. 12 (La.App. 4 Cir. 10/15/03), 858 So.2d 697, 705 ("When property has been rendered permanently non-usable for its only purpose, that is a taking.") Thus, the plaintiffs argue to this court that the court of appeal was correct in rejecting the state's plea of prescription, and the state argues that the court of appeal confused taking and damage claims.
In Columbia Gulf Transmission Company v. Hoyt, 252 La. 921, 215 So.2d 114 (1968), this court held that a predial lease is property within the meaning of the Louisiana Constitution, requiring just compensation to the lessee before the lease rights were damaged. Hoyt, 252 La. at *1115 937-938, 215 So.2d at 120-121. Similarly, in Avenal, 100 F.3d at 936, the federal appellate court acknowledged that the plaintiffs owned valuable property rights in their leases of the water bottoms and remarked that the question was not whether plaintiffs had a constitutionally protected property interest, but whether that property interest was taken by the government.
As recognized by the majority in Hoyt, the Louisiana Supreme Court distinguished between what is considered "taken" as opposed to what is considered "damaged." "[P]roperty is `taken' when the public authority acquires the right of ownership or one of its recognized dismemberments. Property is considered `damaged' when the action of the public authority results in the diminution of the value of the property." (Citations omitted.) Hoyt, 252 La. at 935, 215 So.2d at 120.[7] Because the state did not acquire any right of ownership, there was no taking from a Louisiana constitutional standpoint. Id. In the instant case, testimony at trial established many of the leases at issue were non-productive because they fell within the seasonal closure line; however, the leaseholders chose to retain the leases because they derive revenue from oil and gas interests that continue to conduct surveys, seismic activities, oil exploration, and lay pipelines on the leaseholds. Avenal, 01-0843 at 54, 858 So.2d at 738-739 (dissent). Other testimony indicated there was some oyster production subsequent to Caernarvon's going on line.
Lastly, as the majority notes, the state owns the water, water bottoms, and oysters. The state cannot take from someone that which it owns. Further, the oyster farmers still possess the leasehold interests. Thus, rather than taking, the state damaged[8] one aspect of plaintiffs' leasehold *1116 interest; therefore, LSA-R.S. 13:5111 which applies to a taking is inapplicable to plaintiffs' claims.
Having written to emphasize the significance of the divergent interests raised in this matter, I respectfully concur.
NOTES
[*] Retired Judge Thomas C. Wicker, Jr., sitting as Justice ad hoc. Associate Justice Chet D. Traylor, recused.
[1] Louisiana maintains considerable acreage devoted to public seed grounds. These public seed grounds tend to be farther offshore than the leased acreage. The public seed grounds are open for approximately seven months of the year (September to the following March). The public seed grounds provide a source of seed oysters that can be transplanted by lessees to their individual leases for harvest at a later date; the public grounds also contain market-sized oysters that can be harvested by anyone and marketed directly with no transplanting requirements.
[1a] This clause will be discussed in detail later in the opinion.
[2] The CIAC is the advisory group of agency representatives and stakeholders who, among other things, determine the flow rate of Caernarvon.
[3] A memo issued by Greg Laiche of the DWF on November 7, 1990 explained that the effects Caernarvon might have on the oyster fishermen's leases were unknown, but recognized that "certain fisheries resources could be displaced." He described the relay program as follows:

In regards to assisting the state in any mitigative damages resulting from the operation of the structure, the Department is prepared to compensate oyster fishermen whose oyster leases are adversely affected by the operation of the structure, in five years, by the relocation of oyster leases out of the area on an acre for acre basis at that time. The lessee would have to document these damages to obtain a lease relocation. Any such relocations would be restricted to areas designated for leasing in the vicinity.
LDWF, along with DHH is allowing oyster lease holders, south of the Caernarvon Freshwater Diversion Structure out to the Tennessee Gas Pipeline (Double pipeline) an opportunity to relocate oysters which may be affected by the operation of the structure.
Oysters may be relocated from December 3-7 [1990] beginning one-half hour before sunrise and ending one-half hour after sunset except on December 7, when all relocation activity must cease at 12 noon. Applications for relocation permits must be filed ten days prior to December 3rd. The LDWF Enforcement Division will enforce the relocation as per the attached requirements and rules. LDWF biologist will also monitor the relocation in an effort to estimate production of the leases from which oysters are removed.
[4] In fact, oyster productivity on the public seed grounds increased by 300%, a fact acknowledged by plaintiffs in brief.
[5] On August 16, 1996, the trial court issued a judgment certifying a class with the following definition:

All persons, corporations, or other legal entities who have held, or who now have ownership interests in oyster leases located in that part of Breton Sound west of the "red line" that is, that boundary or line established by the Louisiana Department of Wildlife and Fisheries designated in the western most limits of this State's oyster seed grounds; south of the Mississippi River Gulf Outlet and north of Kelly Gap.
DNR appealed and applied for writs related to both the Reasons for Certification and the Judgment of certification, but writs were denied.
[6] The exact amount of oyster leases held by the named plaintiffs in this law suit is somewhat unclear. Plaintiffs produced the leases at trial in Exhibits 1-4, which, according to the record in this Court, amount to 202 leases. The court of appeal and the defendants have stated that there are 204 leases.
[7] The federal circuit court ruled in Avenal as follows:

The case before us presents a textbook example of a situation in which the plaintiffs, in the face of established public concerns and while governmental efforts to address those concerns were well known, moved to take advantage of the existing conditions for their own economic benefit. There is nothing wrong with their having done that; the State of Louisiana provided the mechanism for it, and their own initiative gave them whatever economic advantages the situation afforded. It is hard for them to claim surprise, however, that the pre-existing salinity conditions, created at least in part by earlier government activity, were not left alone, but were again tampered with to their (this time) disadvantage.
Though as entrepeneurs they are entitled to capitalize on the opportunities afforded by government action, they cannot here insist on a guarantee of non-interference by government when they well know or should have known that, in response to widely-shared public concerns, including concerns of the oystering industry itself, government actions were being planned and executed that would directly affect their new economic investments. These concerns and plans date back to the early part of the century, and beginning in the 1950's and 1960's were actively being pursued by state and federal agencies. They were certainly a part of the environment in which the raising and harvesting of oysters in the Louisiana marshes were conducted. Assuming, as we must, that these plaintiffs did not invest in their leases until the 1970's, these plaintiffs, in the words of Penn Central, cannot have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments.
Avenal v. State, supra, 100 F.3d at 937.
[8] Following these decisions, the DNR filed a motion for summary judgment in this state action, alleging that collateral estoppel barred the relitigation of the "takings" issue already decided by the federal courts. The trial court denied the motion, and the court of appeal agreed, holding on rehearing that the legal standard applied in the federal case was not the same because "the `distinct' investment-backed expectations" test of Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), is irrelevant to the question of whether a taking has occurred under Louisiana law. Avenal v. State, 99-0127 (La.3/15/00), 757 So.2d 1 (on rehearing). This Court denied writs. Avenal v. State, 00-1077 (La.6/23/00), 767 So.2d 41, cert. denied, La. Dept. of Natural Resources v. Avenal, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 486 (2000).
[9] The named plaintiffs produced a limited amount of information regarding the actual amount of income earned from the sale of oysters on their leases before and after Caernarvon went online, but this information fell far short of establishing the amount of damages that would be necessary to prove actual damages in this case.
[10] This damage award was based on a formula, referred to as the "currency cultch matrix," which uses the cost of cultch (installed) as the currency for valuing oyster leases. "Cultch" is defined by Webster's Dictionary as "material laid down on oyster grounds to furnish point of attachment for young oysters." A layer of cultch on the water bottom is necessary for the growth of oysters. The currency cultch matrix looks to the costs of the cultch (installed) on a per acre basis. In the present case, the currency cultch matrix measured the value of plaintiffs' leases by the cost of replacing them at another location by the replacement of six inches of cultch on every inch of plaintiffs' leases, even though there was no proof offered at trial that any of the leases ever contained six inches of cultch. The court of appeal appears to have justified this holding based on another coastal area affected by a coastal diversion, Davis Pond, where the State settled with the oyster lessees based on the currency cultch matrix formula. However, those oyster lessees were only compensated to the extent necessary to cover their leases in 1 1/2 inches of cultch. Further, the qualifying Davis Pond leases were all "active and productive," and only qualified for evaluation under the damage formula if they agreed to a side-scan sonar survey using an acoustic remote-sensing device to determine the amount of cultch, reef or hard bottom in each lease, the replacement of which was the only thing they would be compensated. Prior to trial in this case, the plaintiffs in this matter rejected a similar offer by the state.

While we do not reach the issue of the exorbitant amount of damages awarded by the lower courts in this opinion, this Court has held that, albeit in a tort case under La. R.S. 56:423, that an oyster lessee is not entitled to restoration or replacement costs, as the state being the owner of the property, and not the lessee, is the party with the real and actual interest in restoring or rebuilding the property. Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243, 1255.
[11] We have received numerous amicus briefs in this case from various parties, including, but not limited to, the Coalition to Restore Coastal Louisiana and Environmental Defense, the Business Council of New Orleans & the River Region, Inc., the Louisiana Department of Transportation and Development, the Police Jury Association of Louisiana, Inc., Professor Oliver Houck, the Louisiana Division of Administration, the City of New Orleans, Louisiana Department of Wildlife and Fisheries, the Slavik family, and the Fishermen and Concerned Citizens Association, Inc.
[12] La. R.S. 56:4 provides:

Nothing in this Title and particularly in Section 3 of this Part affects in any way the authority of the Louisiana Department of Natural Resources to lease or otherwise administer the beds and bottoms of navigable rivers, streams, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico within the territory or jurisdiction of the state, as established by law and regulations and promulgated thereunder.
[13] Among the leases presented by the plaintiffs in Exhibits 1-4, 12 are dated prior to 1989 and do not contain hold harmless clauses. However, one of these leases, Lease No. 26236 included with the Avenal leases, was issued to Donald Campo, Sr., and there we can find no indication in the record that it was ever transferred to Avenal. In any event, when we refer to the leases dated prior to 1989, we will be referring to all 12 leases included in Exhibits 1-4.
[14] This clause provided:

Lessor hereby formally advises and Lessee acknowledges the following: The State has undertaken, and intends to undertake, a number of coastal restoration projects, including freshwater diversion projects, within the State. The decision to undertake these projects was based upon the need to conserve, restore, create, and enhance coastal wetlands as well as dependent fish and wildlife populations through a number of methods, including the recreation of the historical role of the Mississippi River system, which formerly not only nourished but also established these wetlands prior to the construction of the Mississippi River levee system. Inasmuch as these wetlands continue to disappear at an alarming rate, it is necessary to partially divert the flow of a number of the rivers, streams, canals, bayous, and other water bodies within the State of Louisiana, or to move dredge spoil or conduct other coastal restoration projects to re-establish these wetlands. As a result, it is possible, if not probable, that these coastal restoration projects may have some adverse effect on the waters and water bottoms, as well as on any oysters on some of the State water bottoms leased to oyster fishermen.
The State is obligated pursuant to Article IX, Section I of the Louisiana constitution as well as the public trust doctrine associated therewith, to undertake these coastal restoration projects so as to protect Louisiana's natural resources for the benefit of the people of the State. Accordingly, pursuant to the Louisiana Constitution and the public trust doctrine, the State as Lessor hereby conveys to Lessee a limited interest in the water bottom which is described in this lease, subject to the conditions that: (1) this lease is subservient to the State's past, present or future coastal restoration projects; (2) the State's coastal restoration projects may cause adverse effects in the area of this lease; and, (3) the State is only issuing this lease based upon the mutual understanding of both the State and Lessee that Lessee's property interest conveyed by this lease shall not include any right whatsoever to make claims against the State as a result of freshwater diversion or any other coastal restoration projects provided that, the State and the United States shall remain responsible for their own (1) acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power of the State and/or the United States exists; or (2) acts or omissions which constitute criminal, fraudulent, malicious, outrageous, reckless, or flagrant misconduct....
[15] This clause provides:

Lessee further acknowledges that Lessee has no intent to pursue any claims for damages against the State of Louisiana and/or the Wildlife and Fisheries Commission and/or the State's departments and agencies, related to or arising out of or resulting from coastal restoration projects contained in an approved annual Coastal Wetlands Restoration Plan and undertaken by the State for the benefit of the people of Louisiana, including, but not limited to, freshwater diversion projects. Further, in consideration of the issuance of this lease, Lessee shall assume all liability and risk of loss, and agrees that this lease is subservient to all past, present or future coastal restoration projects as described above. Lessee also agrees to indemnify and hold the political subdivisions wherein lies the acreage associated with this oyster lease, and any political subdivision which has implemented or may implement a coastal restoration project affecting this oyster lease as well as the State of Louisiana, and/or the United States, their officials, representatives, employees, agencies, departments and/or commission, harmless from and for, all loss, damage, costs and/or expense in any way associated with this oyster lease and the oysters, cultch, reefs and beds located therein, including any loss, sustained by the Lessee and any affiliated persons or entities working with or through Lessee, arising out of, connected with, incident to, or directly or indirectly resulting from or related to diversion of freshwater or sediment, depositing of dredged spoil or other material or any other action taken pursuant to coastal restoration projects undertaken by the State and/or the United States, ... for the benefit of the people of the State of Louisiana. Such coastal restoration activities include, but are not limited to, the management, preservation, enhancement, creation or restoration of coastal wetlands, water bottoms or dependent fish and wildlife populations. Damages include, but are not limited to, oyster mortality, oyster disease, damaged oyster beds or decreased oyster production, loss of revenue and/or loss of income due to siltation, changes in salinity, pollution or other causes, regardless of the passive, concurrent, active or sole negligence of the State of Louisiana and/or the United States ..., and regardless of whether liability without fault, strict liability, absolute liability, or liability for inverse condemnation, liability for a "taking" in violation of the constitutions of the United States or the State is alleged or imposed upon the State and/or the United States ...
[16] That legislation reads in pertinent part:

Section 214.5 State and political subdivisions of the State held harmless in coastal restoration; licensees and permittees
A. Notwithstanding any other law to the contrary, the State of Louisiana, its political subdivisions, its agents or employees shall be held free and harmless from any claims for loss or damages to rights arising under any lease, permit, or license granted to any individual or other entity for any purpose on State lands or water bottoms from diversions of freshwater or sediment, depositing of dredged or other materials or any other actions, taken for the purpose of management, preservation, enhancement, creation or restoration of coastal wetlands, water bottoms, or related renewable resources.
B. All departments, agencies, boards, or commissions of the State of Louisiana and its political subdivisions shall include language which shall hold the State and its political subdivisions harmless for the purposes set out in this Section and all leases, permits, or licenses granted to any individual or other entity after July 1, 1995.
Acts No. 936, Section 1, effective July 1, 1995. Section 2 of Act 1995, No. 936 provides as follows:
Section 2. This Act is intended to be remedial in nature and delineates legislative intent and shall be retroactive as it applies to any leases, permits, or licenses granted to any individual or other entity on State lands and water bottoms whose rights may be affected by coastal restoration projects.
[17] Act No. 107, 1st Extra Session (2000) resulted in the passage of La. R.S. 56:427.1, which contained language nearly identical to that contained in La. R.S. 49:214.5, which required that the State be held harmless from claims for alleged oyster mortality as a result of coastal restoration projects and required the insertion of an indemnity clause in all leases on State water bottoms issued or renewed after the effective date of the statute, July1, 1995. Both statutes were stated to be "remedial" and therefore purported to have retroactive effect insofar as leases issued before July 1, 1995. We have no reason to rule on the retroactivity issue as we base our ruling on other issues.
[18] The Jurisich court explained this as follows:

Except for reconduction provided in La. Civ.Code art. 2688 (reconduction of lease of predial estate by continued possession after expiration of the term) and 2689 (reconduction of lease of house or room by continued possession after expiration of term), renewal is a matter generally left to contractual negotiation. On the other hand, oyster lease renewal is statutorily provided and is not contingent upon a contractual provision for its existence.
749 So.2d at 600 n. 4.
[19] The stipulated purpose of that clause was to protect an oil and gas company from claims against it brought by a subsequent oyster lessee in the same area claiming damages for oyster mortality and bed damage as a result of the normal operations of the oil and gas company.
[20] This Court has recognized that an oyster lessee has a valuable property right in his oyster beds, for the loss of which he can recover against one whose fault the loss was incurred. Butler v. Baber, 529 So.2d 374 (La.1988); Doucet v. Texas Co., 205 La. 312, 17 So.2d 340, 341 (1944). Accordingly, courts have allowed oyster lessees to recover against third party oil companies under La. C.C. art. 667 for damage to their oyster beds caused by the oil companies' activities. Inabnet v. Exxon Corp., supra (holding that Exxon's use of property injured neighboring oyster lessee's property and constituted fault under Civil Code Article 2315 by analogy to Articles 667-669 such that oyster lessee was entitled to damages under La. R.S. 56:423(B)1 including loss of seed oysters and loss of income from anticipated production, but not restoration costs). However, the basis for the oyster lessee's recovery in these cases was the explicit statutory right of recovery granted in La. R.S. 56:423(B)1 which gives the oyster lessee "the right to maintain an action for damages against any person, partnership, corporation or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee." In all those cases, the tortfeasor was a third party to the lease; no court has ever recognized a right under this statute against the State.
[21] Defendants filed a Peremptory Exception with this Court arguing that legislative action taken subsequent to the filing of this case applies to the facts of this case. The statutes at issue are Act No. 652, (2003) amending and reenacting La. R.S. 49:214.5, and which requires the State to be held harmless for coastal restoration projects (the 2003 Act re-enacted a statute previously amended in 1995, but before the 1995 Amendment to Article 12, § 10 of the Constitution allowing the legislature to expand the scope of the State's sovereign immunity and allowed for retroactive effect for that expanded sovereign immunity). On an issue unrelated to the hold harmless clauses, defendants' peremptory exception also cites Act No. 1295, which resulted in the passage of a joint resolution submitting an amendment to Article I, § 4 for popular vote. The Amendment allows the Legislature to place limitations of the extent of recovery for "takings" or damages due to coastal restoration projects. Act No. 1295 also formed the basis for Act No. 583, enacting La. R.S. 49:213.9 to limit the recovery for property taken or affected by coastal restoration. This statute was to have retroactive effect and was to become effective if the proposed amendment to the Constitution embodied in Act No. 1295 passed, which it did in 2003.
[22] Although the plaintiffs have asserted only "takings" claims under Art. I, § 4 of the La. Const. and under the Fifth Amendment of the U.S. Const., and did not assert property damage claims against the State, both "takings" claims and damages claims are covered by the hold harmless clauses.
[23] This Court has explained the legislative history behind the 1974 amendment to the Constitution allowing for compensation "to the full extent of his loss" in State Through Dept. of Transp. and Development v. Chambers Inv. Co., Inc., 595 So.2d 598 (La.1992), as follows:

There can be little doubt that one aim of Article I, § 4, of our state constitution in requiring that the owner shall be compensated for property "taken or damaged ... to the full extent of his loss" was to assure that the State and its subdivisions compensate owners for any taking or damaging of their rights with respect to things as well as for any taking or damaging of the objects of those rights. The history of Section 4 reveals a desire to increase the level and scope of compensation beyond that provided by pre-existing state law. The change from the 1921 constitution's language ("just and adequate compensation") to the new phrase ("compensated to the full extent of his loss") was deliberate, prompted by a belief on the part of the sponsors that inadequate awards had been provided under the prior law. L. Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 15 (1974); cf., State, Dept. of Transp. & Dev. v. Dietrich, 555 So.2d 1355, 1358-59 (La.1990); State, Dept. of Highways v. Constant, 369 So.2d 699, 702 (La.1979) (the purpose of the additional language in Article I, § 4 was to compensate an owner for any loss sustained by reason of the taking, and not merely restricted as under the former constitution to the market value of the property taken and to reduction in the market value of the remainder).
595 So.2d at 602.
[24] Act No. 1295 of 2003 added the following, which passed as a constitutional amendment to La. Const. Art. 1, § 4: "(E) Further, the legislature may place limitations on the extent of recovery for the taking of, or loss or damage to, property rights affected by coastal wetlands conservation, management, preservation, enhancement, creation, or restoration activities."
[25] For an explanation of the differences between expropriation and appropriation, see Wynat Development Company v. Board of Levee Commissioners for Parish of Orleans, 97-2121 (La.4/14/98), 710 So.2d 783.
[26] Both the Constitution of 1921 and the Constitution of 1974 provided that property shall not be taken or damaged except for public purposes. Art. I, § 2 provided that "[e]xcept as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." As stated earlier, Art. I, § 4, provides in pertinent part that "[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit." The minutes from the 1973 Constitutional Convention indicate that one change from the 1921 Constitution was that "quick takings" would be expressly allowed under the 1974 Constitution in that the State would not have to pay for the appropriation before it occurred. Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, Vol. VI, pp. 1234-1244. In fact, it was stated that the main purpose of the 1974 Amendment was to allow for appropriations as well as expropriations.
[27] This Court has previously found that even an unrecorded lessee has a recognized property interest entitled to compensation under Art. I, § 4. State Dept. of Transp. and Development v. Jacob, 483 So.2d 592 (La.1986); see also Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed.2d 1083 (1913) (for purposes of state law, a leasehold interest is generally recognized as a property interest). The Jacob court determined that "the clear intent of the framers of [the 1974] Constitution was to expand the right to compensation to include not only the property owners, but also of other persons who have legal status to require compensation such as lessees." Id. at 594.
[28] Plaintiffs have also asserted a claim under the Fifth Amendment of the U.S. Constitution, which provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amendment V; see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 307 n. 1, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (Fifth Amendment applies to the states as well as the federal government).

Under federal law, when the government limits the use a property owner may make of his or her property, without itself occupying or otherwise using the property for government purposes, the classic analytical tool for assessing whether a taking has occurred is the three-part test enunciated by the Supreme Court in Penn Central, supra: the court considers the character of the governmental action, the economic impact on the claimant and, particularly, the extent to which the governmental action has interfered with distinct investment-backed expectations. 438 U.S. at 124, 98 S.Ct. at 2659. As stated in Avenal v. State, supra, 100 F.3d at 937, because the plaintiffs were well aware that Caernarvon was being planned as early as the 1970's, "they cannot have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments." The Supreme Court reaffirmed in Palazzolo v. Rhode Island, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), that when state action results in a partial taking of a claimant's property rights, the Penn Central, analysis, including the investment-backed expectations requirement, is clearly applicable.
The plaintiffs claim, however, that Caernarvon deprived them of all economically beneficial and productive use of their property, and that therefore, the Penn Central test is not applicable. However, if Caernarvon did entirely deprive them of all economically beneficial and productive use of their property rights, the plaintiffs are still not entitled to compensation as Caernarvon was a valid exercise of the state's police power under federal law. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).
The Lucas Court reasoned that unlike a partial taking, where the elements of Penn Central were "keenly relevant" to the takings analysis, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886, a regulation that prohibited all economically beneficial use of land should be treated in the same manner as state action which results in a "permanent physical occupation" of the land, in which the government has a categorical duty to compensate the former owner. Id. at 1028-29, 112 S.Ct. 2886. However, even in this circumstance, compensation is not owed if the state action is in accordance with a "background principle" of the state's property law that already prohibit the landowner from the use he claims was taken, or is undertaken in the exercise of the state's police power. As explained by the Lucas court, compensation is not owed because no legally existing rights were being taken under those circumstances.
Thus, even analogizing the operation of Caernarvon to a regulatory taking that eliminated all economically beneficial uses of the oyster lessees' property or a permanent invasion of plaintiffs' leases, the plaintiffs would not be entitled to compensation under the Lucas analysis for two reasons. First, the right of the state to disperse fresh water from the Mississippi River over saltwater marshes in order to prevent coastal erosion is derived from a background principle of Louisiana law. The concerns of the state and federal government and the plans to divert water to alleviate these concerns date back as early as the 1950s and 60s and were certainly a part of the environment in which the raising and harvesting of oysters were conducted. The State has always had this right and their leases were expressly made subject to this right. More particularly, the oyster fishermen knew this particular project was underway and that it would alter the salinity levels in the waters covering their leases.
Secondly, the freshening of these waters in order to prevent further coastal erosion and save Louisiana's coast is a matter of "actual necessity" as it will "forstall [a] grave threat to the lives and property of others." 505 U.S. at 1029, n. 16, 112 S.Ct. 2886. See also Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (in which the Court rejected the claim that Virginia state officials effected a taking by authorizing the destruction of cedar trees which harbored pests threatening the state's apple crop holding that "[w]hen forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public"). The plaintiffs freely admit that coastal erosion is a serious threat that affects this State and that Caernarvon has been successful in preventing it. See also New Orleans Campaign For a Living Wage v. City of New Orleans, 02-0991 (La.9/4/02), 825 So.2d 1098, 1104 (defining the State's police power under Louisiana law); Bass v. State, 34 La. Ann. 494 (1882); Bd. of Comr's of Orleans Levee Dist. v. Dept. of Nat'l Resources, 496 So.2d 281, 289 (La.1986) (on rehearing).
[29] It is well settled under Louisiana law that when conflicting statutes are applicable, the one more specifically directed to the matter applies. Estate of Patout v. City of New Iberia, 98-0961 (La.7/7/99), 738 So.2d 544. While La. C.C. art. 3492 provides a one year general prescriptive period for delictual actions, La. R.S. 9:5624 is directly applicable to claims for private property damaged for public purposes.
[30] La. R.S. 9:5624 was amended in 1987 by Act No. 339, § 1, it formerly read:

When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run when the damages are sustained.
The Court in Lyman held that the prescriptive period begins to run when the first occurrence of damage is actually sustained. 500 So.2d at 393. The Court held that La. R.S. 9:5624 was intended to be an exception to La. C.C. art. 3492, the general one-year prescriptive statute for delictual actions, by allowing two years from bringing suit when private property is damaged for public purpose. Id. However, "while allowing an addition year to bring suit, the statute serves to limit governmental exposure by requiring `any and all actions' must be brought within two years after damages are sustained." Id. at 392.
[31] We reject plaintiffs' argument that any claim they have under La. R.S. 9:5624 has not prescribed because their leases were not really damaged until the rate of flow was increased in 1994 from 4,000 cubic feet per second to 8,000 cubic feet per second. This is contrary to the class representatives' testimony at trial, and contrary to the position they have held all along. Further, La. R.S. 9:5624 has a strict two-year time limit, and, as we stated in Lyman, the legislature intended to limit governmental exposure by requiring "any and all actions" to be brought within this time limit. Further, the time limit is not subject to the continuing tort doctrine, as is the general one-year prescriptive period of La. C.C. art. 3492. Estate of Patout, supra at 549, n. 5. Even under the statute as it existed before the 1987 amendment, prescription began to run from the moment the first damage is actually sustained. Lyman, supra. The time period provided by La. R.S. 9:5624 as it now reads appears to limit governmental exposure even further, by commencing the running of prescription upon "completion and acceptance of the public works." Thus, the plaintiffs were required to bring "any and all actions" for damages within two years after completion and acceptance of Caernarvon.
[32] While we have been unable to ascertain from the record the exact date of "acceptance" of Caernarvon, given the above key dates, it necessarily must have been accepted between April and November of 1991.
[33] Defendants filed an exception of prescription under La. R.S. 9:5624 on September 28, 2000.
[1] Learning from experience, the fishermen began moving "seed oysters" from overcrowded reefs to areas where salinity was more favorable, current more steady, and food more plentiful. The oystermen gathered the seed oysters, planted them in a favorable spot, allowed the seed to grow into mature, market-size oysters, and harvested the crop.
[2] See Footnote 10 of majority opinion.
[3] The plight of Louisiana's coast and its wetlands warrants national concern.

Many factors, some natural, some due to human intervention, are converging to result in the loss of Louisiana's wetlands and the concomitant alteration of its coast. Louisiana, because of its many bays and sounds, has the longest coastline (15,000 miles) of any state and 41 percent of the nation's wetlands. Louisiana Department of Economic Development available at http:// www.crt.state.la.us/crt/profiles/industry.htm. The losses are alarming and devastating.
The rate of coastal land loss in Louisiana has reached catastrophic proportions. Within the last 50 years, land loss rates have exceeded 40 square miles per year, and in the 1990's the rate has been estimated to be between 25 and 35 square miles each year. This loss represents 80% of the coastal wetland loss in the entire continental United States.
The reasons for wetland loss are complex and vary across the state. Since the scale of the problem was recognized and quantified in the 1970's, much has been learned about the factors that cause marshes to change to open water and that result in barrier island fragmentation and submergence. The effects of natural processes like subsidence and storms have combined with human actions at large and small scales to produce a system on the verge of collapse. System collapse threatens the continued productivity of Louisiana's bountiful coastal ecosystems, the economic viability of its industries, and the safety of its residents. If recent loss rates continue into the future, even taking into account current restoration efforts, then by 2050 coastal Louisiana will lose more than 630,000 additional acres of coastal marshes, swamps, and islands. The loss could be greater, especially if worst-case scenario projections of sea-level rise are realized, but in some places there is nothing left to lose.
Along with the loss of acreage goes the loss of the various functions and values associated with the wetlands: commercial harvests of fisheries, furbearers, and alligators; recreational fishing and hunting, and ecotourism; habitats for threatened and endangered species; water quality improvement; navigation corridors and port facilities; flood control, including buffering hurricane storm surges; and the intangible value of land settled centuries ago and passed down through generations. The public use value of this loss is estimated to be in excess of $37 billion by 2050, but the losses associated with cultures and heritage are immeasurable. (Emphasis supplied.)
Louisiana Coastal Wetlands Conservation and Restoration Task Force and the Wetlands Conservation and Restoration Authority.1998. Coast 2050: Toward a sustainable Coastal Louisiana. Louisiana Department of Natural Resources. Baton Rouge, La., Chapter 1, page 1. (In 1998, the State of Louisiana and its Federal partners approved a coastal restoration plan entitled Coast 2050: Toward a Sustainable Coastal Louisiana. That document presented strategies jointly developed by federal, state, and local interests to address Louisiana's massive coastal land loss problem.)
Eloquently stated is the following:
Over a million acres have disappeared since the 1930s and, at the present loss rate of 24 square miles a year, an additional 500 square miles of coastal land will wash away by 2050. Gone forever will be precious nursery habitat for fish and shellfish; nesting and feeding grounds for migratory waterfowl and wildlife; storm surge protection for vulnerable coastal communities, ports, and roads; and land that buffers oil and gas pipelines, production platforms, and shore-based processing facilities against storm and wave damage.
Louisiana's coastal marshes are the cradle of nearly one-third of the total commercial fish and shellfish harvest in the lower 48 states. Seventeen percent of the nation's oil and twenty-five percent of its natural gas are mined in the state's offshore waters. Louisiana's four major ports handle more than 21 percent of U.S. foreign waterborne trade. Calling Louisiana's coastal marshes "a national treasure" is no exaggeration. (Emphasis supplied.)
Postings of Rhea Gary and C.C. Lockwood, http:// www.marshmission.com/problem.cfm (2003).
[4] See discussion of Penn Central and of plaintiffs' claim under the Fifth Amendment of the United States Constitution at Footnote 28 of the majority opinion.
[5] Regarding any claims of the plaintiffs asserted pursuant to the U.S. Const. amend. V, I believe these claims are properly denied based on the rationale of the federal court in Avenal, 100 F.3d 933.
[6] Louisiana jurisprudence has applied the two prescriptive periods on a case by case basis, usually with the issue being whether one of these two prescriptive periods for eminent domain cases was applicable instead of some other prescriptive period, such as the one-year limitation for asserting tort claims. The two-year prescriptive period of LSA-R.S. 9:5624 has been applied in various factual situations. See, Lyman v. Town of Sunset, 500 So.2d 390 (La.1987) (Land developer's suit against town, alleging town's operation of landfill diminished property value and marketability of subdivision development, was subject to two-year prescriptive period.); see also appellate court cases cited therein, Florsheim v. Department of Highways, 201 So.2d 155 (La.App. 2 Cir.1967) (Claim for compensation by owner of buildings located adjacent to interstate highway right-of-way and structurally damaged by vibrations associated with construction of the highway was brought within the two-year limitation.); Nuckolls v. Louisiana State Highway Department, 337 So.2d 313 (La.App. 2 Cir.1976) (Claim of landowner whose property was adjacent to public highway construction site who sued for flooding caused by unauthorized alteration of natural drainage was not timely when filed more than two years from date of the first flooding.); Carbo v. Hart, 459 So.2d 1228 (La.App. 1 Cir.1984), writ denied, 462 So.2d 654 (1985) (Action against city for damages arising from flooding of plaintiffs' property which was immediately adjacent to city limits allegedly caused by work on a man-made drainage canal was time barred by two-year prescriptive period.); Broussard v. Booth, 446 So.2d 974 (La.App. 3 Cir.), writ denied, 449 So.2d 1357 (1984) (Plaintiff's claim against police jury for flooding of his property after a drainage construction project was time-barred because filed more than two years after plaintiff became aware of the flooding; police jury's action resulted in damages to plaintiff's property and not a taking of the property when police jury had not expropriated, taken possession of the property, nor constructed any facility upon, under or over his property.)
[7] Hoyt was decided before the adoption of the Louisiana Constitution of 1974. Both the Constitution of 1921 and the Constitution of 1974 provided that property shall not be taken or damaged except for public purposes. Although Article I, section 2 of the 1921 Constitution provided that "just and adequate compensation" was to be paid, while Article I, section 4 of the 1974 Constitution provides that a party whose property is expropriated "shall be compensated to the full extent of his loss[,]" the "taken or damaged" language remained unchanged.
[8] Although I conclude there was no taking, for the sake of analysis, I will assume there were damages. However, a forceful argument can be made to the effect that if the state exercises its police power to avoid a public calamity or in cases of imminent peril to the general welfare, there is no compensable taking or damage. See, 29A CJS Eminent Domain § 8-10, p. 104-109. Here, the project was commenced, in part, because of the requests of the oyster industry. The area affected had not supported oysters historically until the construction of the levee system artificially altered salinity levels. The fresh water intrusion project, which had been publically discussed and planned for decades before its ultimate construction, benefitted the entire oyster industry because the public seed grounds blossomed, thus, limiting any potential losses suffered by plaintiffs. Further, relocation of the leaseholds was offered and plaintiffs declined. The salinity level to which the plaintiffs claim entitlement was an artificial level, resulting from salt water intrusion due partially to levee construction. It is this salinity level which, in part, is adversely impacting the coast. "The destruction of property to avert impending peril or disaster ... is an exercise of the police power, and not a taking under the power of eminent domain." 29A CJS § 9, pp. 108-109. See also, footnote 3, supra. The majority's discussion concerning the public trust doctrine is consistent with the state's police power and the following constitutional provision, which prefaces the portions of La. Const. art. I, § 4 invoked by plaintiffs in their claim for compensation: "Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power." (Emphasis supplied.)