STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2021 CA 1437

CITY BAR, INC., ROSIE'S TAVERN, LLC, BIG DAN'S BAR, INC., BIG TYME INVESTMENTS, LLC D/B/A BIG DADDY'S PUB & GRUB, CD ENTERPRISES OF HOUMA LLC D/B/A LARUSSA'S LOUNGE, CKBCPB5 LLC D/B/A THE CHATTER BOX, DE & BC ENTERPRISES, LLC D/B/A D&B SPORTS BAR, DOUG MCCARTHY ENTERPRISES, INC. D/B/A "501", JOM LLC D/B/A JUST ONE MORE, LONGSHOTS 1, LLC D/B/A LONGSHOTZ, MY PLACE BAR & GRILL, LLC, THE OUTER LIMITS BAR, LLC, PARADISE SPORTS BAR & DAIQUIRIS, LLC D/B/A EPIC LOUNGE, POOL DO'S SPORTS BAR LLP, R&J LAPEYROUSE, LLC D/B/A JEAUX'S NEW HORIZON, R. HEASLEY, LLC D/B/A RAM ROD'S SALOON, SANDI'S ANCHOR LOUNGE, LLC D/B/A DA CAMP, TAP DAT, LLC D/B/A THE BRASS MONKEY, TIPSY CAJUN, LLC WANOUS, LLC, D/B/A AJ'S 2ND ST. PUB, 910 E MAIN 33, LLC D/B/A QUARTER TAVERN, GROS MARINE SERVICES, MADISONVILLE RIVERSIDE BAR, LLC. SWIDERSKI INVESTMENTS LLC DBA LENNY'S AND YE OLDE MEMORIES, LLC

VERSUS

JOHN BEL EDWARDS, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF LOUISIANA

Judgment rendered __AUG 3 0 2022__

* * * * *

On Appeal from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
No. C703353
The Honorable Timothy E. Kelley, Judge Presiding

* * * * *

Jimmy R. Faircloth, Jr.
Mary Katherine Price
Richard F. Norem, III
Alexandria, LA

Attorneys for Plaintiffs/Appellants
City Bar, Inc. *et. al.*

James M. Garner
Darnell Bludworth
Joshua S. Force
Christopher T. Chocheles
Josie N. Serigne
Jack M. Weiss
New Orleans, LA
Matthew F. Block
Baton Rouge, LA

Attorneys for Defendant/Appellee
John Bel Edwards, In His Official
Capacity as Governor of the State of
Louisiana

**BEFORE: GUIDRY, HOLDRIDGE, AND CHUTZ, JJ.**

WRC, concurs

Hold, J. (concurs in result.

**HOLDRIDGE, J.**

On January 11, 2021, City Bar, Inc. and other Louisiana business owners operating bars serving alcohol and/or food pursuant to lawfully issued permits by Louisiana authorities (sometimes referred to collectively as the "bar owners"), filed this class action lawsuit against John Bel Edwards in his official capacity as the Governor of Louisiana. In the petition, the bar owners alleged that they were uniquely singled-out by a series of Executive Orders (sometimes referred to collectively as the "Bar Closure Orders") closing and restricting the operation of bars statewide for the purpose of slowing the spread of COVID-19. They sought just compensation for the taking of their property, permits, business operations, and income, to serve the public good under the Governor's authority to confiscate or commandeer private property pursuant to Article I, Section 4 of the Louisiana Constitution and the Louisiana Health Emergency Powers Act, La. R.S. 29:760 *et.seq.* (LHEPA).

In their original and amended petitions, the bar owners alleged the following facts: On March 11, 2020, the World Health Organization declared a global pandemic in response to the spread of COVID-19, an infectious disease. That same day, Governor Edwards declared a statewide public health emergency under LHEPA as a result of the imminent, yet then-unknown threat posed to Louisiana citizens by COVID-19. On March 22, 2020, Governor Edwards signed 33 JBE 2020, commonly referred to as the "Stay at Home Order," directing Louisiana citizens to stay at home unless taking essential trips and ordering the closure of non-essential businesses. The Stay at Home Order mandated the closure of pool halls, concert and music halls, and bars.

Beginning in April of 2020, the Federal Government released a series of guidelines for "opening up America again," which included a three-phased approach

2

to re-opening the country based on advice of public health experts. On April 30, 2020, Governor Edwards renewed the statewide Stay at Home Order, and three weeks later, issued an order moving Louisiana into Phase 1 of reopening. The order permitted certain businesses, including bars with a state-issued food services permit, to reopen at 25% occupancy. However, bars without food service permits issued by the Louisiana Department of Health remained closed to the public.

On June 5, 2020, Governor Edwards issued an order moving Louisiana into Phase 2 of the reopening, initially permitting bars, which had been shuttered for nearly two and a half months, to be reopened. Bars serving food were allowed to operate at 50% capacity. However, on July 11, 2020, the Governor issued another order mandating the re-closure of all bars, but no other businesses, for on-premises consumption. On July 23, 2020, the Governor extended the Bar Closure Order, but permitted all other non-essential businesses to reopen under certain restrictions. In August of 2020, the Governor extended the Bar Closure Order on August 6th and 26th.

On September 11, 2020, the Governor issued an order moving Louisiana into Phase 3 of the reopening. Although all other businesses were allowed to operate at 75% capacity, bars were allowed to reopen at 25% capacity and under certain conditions: (1) the parish where the bar is located had 5% or less COVID-19 positivity for two weeks, and (2) the Parish elected to opt-in and reopen bars.

After being essentially closed for nine months, by mid-October to early November, bars around the state were beginning to reopen at 25% capacity. However, on November 24, 2020, in response to an increase in COVID-19 cases, the Governor issued an order moving Louisiana from a Phase 3 reopening to a modified Phase 2 shutdown effective through at least February 10, 2021. Modified Phase 2 order effectively forced bars to close again entirely.

The bar owners alleged that the Governor's Bar Closure Order and extensions thereof (referred to collectively as the Bar Closure Orders) deprived them of the lawful use of their permits, in particular, the right to sell alcohol for on-premises consumption, as the bars had been effectively closed since the March 2020 Stay at Home Order, except for brief, sporadic periods during the Phase 2 and Phase 3 orders when 25% occupancy was allowed.

The bar owners asserted three causes of action which they claimed entitled them to just compensation and damages caused by the Bar Closure Orders. In Count I of the petition, the bar owners asserted a cause of action for inverse condemnation under Article I, Section 4 of the Louisiana Constitution, which provides in part that "property shall not be taken or damaged by the state...except for public purposes and with just compensation paid to the owner or into court for his benefit." The bar owners based their takings claims on the three-pronged test for evaluating takings claims under the Louisiana Constitution enunciated by the Louisiana Supreme Court in **State Through Department of Transportation and Development v. Chambers Investment Co., Inc.**, 595 So.2d 598, 603 (La. 1992). The bar owners alleged that the ownership of a business is a fundamental right protected by the Louisiana Constitution, and further, that they have constitutionally protected property rights in lawfully-issued alcohol permits and in business enterprises operating as bars. Plaintiffs alleged that their constitutional property rights were taken and damaged under the Bar Closure Orders for the express purpose of protecting the public by removing or reducing a risk to public health or safety and that the removal of a threat to public health or safety caused by the existing use or disuse of property constitutes a "public purpose" under Article I, Section 4 of the Constitution.

In Count II of the petition, the bar owners alleged that the Bar Closure Orders constituted a "regulatory taking" under Article I, Section 4 of the Louisiana

4

Constitution and the jurisprudence construing that provision. The bar owners cited Louisiana jurisprudence recognizing that a regulatory taking occurs when a regulation destroys a major portion of the property's value or eliminates the practical economic uses of the property. They alleged that the Bar Closure Orders destroyed the value of their permits by preventing them from engaging in the sole economic use of those permits, on-premises consumption of alcoholic beverages. Therefore, the bar owners claimed, the closure of bars for on-premises consumption constituted a regulatory taking.

In Count III of the petition, the bar owners asserted a cause of action for the "statutory taking" of their property. They alleged that the Bar Closure Orders, which were issued under the authority of LHEPA, which provides that the Governor may, "[s]ubject to any applicable requirements for compensation, commandeer or **utilize** any private property if he finds this necessary to cope with the disaster or emergency." La. R.S. 29:766(D)(4) (Emphasis added). They also cited a similar provision contained in the Louisiana Homeland Security Assistance and Disaster Act, La. R.S. 29:724(D)(4). The bar owners asserted that the commandeering or utilization of property by executive order through the LHEPA is a particular kind of statutory taking under Louisiana law. They also cited La. R.S. 29:771(C), insisting that it mandates compensation for private property "lawfully taken or appropriated by a public health authority for its temporary or permanent use during a public health emergency declared by the governor...." According to the bar owners, the Governor promulgated the Bar Closure Orders closing their establishments for the express purpose of coping with the emergency declaration by protecting the public at large from the potential transmission of COVID-19 by their customers, not by or from the bar owners or their business activities. The bar owners maintained the closure of their businesses to protect some members of the public from other members of the

5

public constitutes a statutory taking through the inverse commandeering or utilization of private property under LHEPA, entitling them to just compensation and damages caused by that statutory taking.

The Governor filed a peremptory exception raising the objection of no cause of action, asserting that the bar owners could not state cognizable takings claims under Louisiana law. The Governor argued that his exercise of the State's police power to implement life-saving measures in promulgating the Bar Closure Orders did not constitute a "taking" of the bar owners' property, regardless of whether that property consists of permits to sell alcohol or the bars themselves. The Governor urged that under Louisiana law, there is no compensable taking when a deprivation of property results from a valid exercise of the State's power to forestall a grave threat to the lives and property of others. The Governor insisted that the use of a bar as a place for alcohol consumption and social gathering at the time the regulations were implemented threatened to injure the larger community by increasing the spread of COVID-19. Accordingly, the Governor posited that he discharged his duty to protect the lives of Louisiana citizens in an emergency by restricting activities at bars, and any damages resulting to the bar owners from those restrictions are not compensable under Louisiana law.

The trial court agreed with the Governor's position and granted the objection of no cause of action. In oral reasons for ruling, the court found that the Bar Closure Orders did not constitute takings for use of the bar owners' properties or rights by the government, but instead were implemented as safety measures to protect the public. The court found there had been no expropriation of the bar owners' properties that would entitle them to just compensation under Louisiana law. The trial court stressed that the pressure of a great danger, like a global pandemic, justified reasonable restrictions of constitutional rights for the safety of the general public.

6

The bar owners appealed, arguing that the trial court erred finding that they failed to allege a constitutional or statutory cause of action for compensation and damages for the inverse condemnation or use of their private property as a result of the Governor's orders issued to cope with the COVID-19 emergency.

## NO CAUSE OF ACTION

The function of the peremptory exception raising the objection of no cause of action is to test the legal sufficiency of the pleading by determining whether the law extends a remedy against the defendant to anyone under the factual allegations of the petition. **Badeaux v. Southwest Computer Bureau, Inc.**, 2005-0612, 2005-719 (La. 3/17/06), 929 So.2d 1211, 1217. The focus of an objection of no cause of action is whether the law provides a remedy against a particular defendant. **Robertson v. Sun Life Financial**, 2009-2275 (6/11/10), 40 So.3d 507, 511.

The burden of demonstrating that the petition states no cause of action is on the mover. **Reyer v. Milton Homes, LLC**, 2018-0580 (La. App. 1st Cir. 2/25/19), 272 So.3d 604, 607. The objection is triable on the face of the pleading, and for the purpose of determining the issues raised by the objection, the well-pleaded facts in the petition must be accepted as true. **Calloway v. Lobrano**, 2016-1170 (La. App. 1st Cir. 4/12/17), 218 So.3d 644, 648. No evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action. La. C.C.P. art. 931.

Because the objection of no cause of action raises a question of law, and the trial court's decision is based solely on the sufficiency of the petition, the appellate court conducts a *de novo* review of the trial court's ruling on the objection. **Badeaux**, 929 So.2d at 1217. An objection of no cause of action should be granted only when it appears beyond doubt that there are no set of facts in support of any claim against the particular defendant in the case. Every reasonable interpretation

7

must be accorded the language used in the petition in favor of maintaining its sufficiency and affording the plaintiff an opportunity of presenting evidence at trial. Moreover, if the petition states a cause of action on any ground or portion of the demand, the objection should be overruled. Id. Thus, the question to be asked in evaluating an objection of no cause of action is whether, viewed in the light most favorable to the plaintiff, and with every doubt resolved in the plaintiff's behalf, the petition states any valid cause of action against the defendant for relief. **Calloway**, 218 So.3d at 648-649.

## CONSITUTIONAL TAKINGS CLAIMS

In this case, the bar owners maintain that the Governor's Bar Closure Orders severely harmed, and in some cases, destroyed their property rights for a public purpose, entitling them to just compensation under Article I, Section 4 of the Louisiana Constitution, which provides, in pertinent part:

> (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable restrictions and the reasonable exercise of the police power.
>
> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit. ...
>
> (2) As used in Subparagraph (1) of this Paragraph..."public purpose" shall be limited to the following:
> ***
> (c) The removal of a threat to public health or safety caused by the existing use or disuse of the property.

The bar owners contend that the Governor's targeted closure of bars resulted in the taking or damage of their property "in the constitutional sense" as required by the Louisiana law to support a claim of inverse condemnation under Article I, Section 4(B) of the Louisiana Constitution. See **Chambers**, 595 So.2d at 602. They also argue that the Governor's targeted closure of bars gives rise to a claim of

compensation for the inverse use of private property "to cope with" an emergency under the various provisions of Governor's Emergency Proclamations.

The Governor contends that emergency actions taken by him to control the spread of COVID cannot subject the State to liability for a taking, and therefore, the trial court properly held that the temporary restriction of on-premises consumption at bars did not constitute a compensable "taking" under the Louisiana Constitution. The Governor maintains that the success of the bar owners' claims turns on the distinction between the State's power of eminent domain and the State's police power to address public health concerns arising during a national, state, and local pandemic. According to the Governor, any blurriness in these concepts can be cleared up by analyzing the nature of the State action, and under such an analysis, the exercise of police power to prevent impending danger does not require compensation.

In support of his claim that the bar owners have no cause of action for compensation under Article I, Section 4 of the Louisiana Constitution, the Governor relies heavily on language in a footnote in the case **Avenal v. State and Department of Natural Resources**, 2003-3521 (La. 10/19/04), 886 So.2d 1085, cert. denied, 544 U.S. 1049, 125 S.Ct. 2305, 161 L.Ed.2d 1090 (2005), which involved a taking claim by oyster fisherman against the Department of Natural Resources. Under all of the circumstances of that case, the Louisiana Supreme Court found that the plaintiffs property rights had not been "taken" because the regulations at issue did not deprive them of all economically beneficial use of their property. **Avenal**, 886 So.2d at 1107. Although the Supreme Court concluded that the regulations may have damaged their property rights in their oyster beds and the profits generated by them under Article I, Section 4 of the Louisiana Constitution, those claims were prescribed. **Avenal**, 886 So.2d at 1107-1110. In a footnote in the lengthy opinion

9

analyzing the takings claims before it, the Court noted that the plaintiffs had also asserted a taking claim under the Fifth Amendment to the United States Constitution, which provides that private property shall not be taken for public use, without just compensation. **Avenal**, 886 So.2d at 1107 n. 28. In response to that claim, the Louisiana Supreme Court observed that even if the plaintiffs were deprived of all economically beneficial and productive use of their property rights, they were not entitled to compensation as the regulation was a valid exercise of the State's police power under federal law. Id. One reason given by the Court for its refusal to recognize a cause of action under federal law was the project would save Louisiana's coast and was thus a matter of "actual necessity" because it would "forestall [a] grave threat to the lives and property of others," citing United States Supreme Court cases stating that proposition. Id. The Governor urges this test is dispositive of whether the bar owners have stated a cause of action under Article I, Section 4 of the Louisiana Constitution. According to the Governor, it is undisputed that his Emergency Proclamations "forestalled a grave threat" and helped to avoid "imminent peril" to the lives of Louisiana residents. Therefore, the Governor submits, the temporary prohibition of onsite consumption at bars in response to the imminent peril threatened by the spread of COVID 19 cannot, under any circumstances, constitute "takings" in the constitutional sense.

We do not find the statements by the Louisiana Supreme Court in a footnote in **Avenal** regarding federal takings claims dispositive of the issue of whether the bar owners have stated a cause of action under Article I, Section 4 of the Louisiana Constitution. The bar owners do not dispute that the Governor had authority through his emergency police powers to issue the Bar Closure Orders; however, they urge that the Governor's reliance on the State's police power as a defense to their takings claims is misguided. They cite the text of Article I, Section 4 specifically

10

recognizing that "[t]he... removal of a threat to public health or safety caused by the existing use or disuse of the property" constitutes a "public purpose" for the purposes of Section B. La. Const. art. I Section 4(B)(2)(c). We agree with the bar owners' position that the fact the Bar Closure Orders were enacted to forestall a threat to public safety is not determinative of whether they have stated takings causes of action under Article I, Section 4 of the Louisiana Constitution. Rather, it is one of the public purposes identified in the Constitution for which private property can be taken by the government "*with* just compensation." (Emphasis added). Therefore, we shall analyze the takings jurisprudence in order to determine whether the Governor met his burden of proving that the bar owners have not stated legally cognizable takings claims on the face of their petition.

The Louisiana Constitution is the supreme law of this State, to which all contrary governmental actions must yield. **Faulk v. Union Pacific Railroad Company,** 2014-1598 (La. 6/30/15), 172 So.3d 1034, 1043. When there has been a taking, the Louisiana Constitution requires compensation even though the State has not initiated expropriation proceedings in accordance with the laws set up for that purpose. This "inverse condemnation" action provides a procedural remedy to a property owner seeking compensation for property already taken or damaged against the government. **Faulk,** 172 So.3d at 1043-1044.

Under the Louisiana Constitution, the action for inverse condemnation is available in all cases where there has been a *taking* or *damaging* of property when just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. **Faulk,** 172 So.3d at 1044. One aim of Article I, Section 4 is to assure that the State compensates owners for any taking or damaging of their rights with respect to things as well as for taking or damaging the objects of those rights. **Chambers,** 595 So.2d at 602. The constitutional command of Article I,

11

Section 4 is self-executing, such that the cause of action arises whenever the State commits a taking without justly compensating the victim. **Faulk,** 172 So.3d at 1044.[1] It is hornbook law that any substantial interference with the free use and enjoyment of property may constitute a taking within the meaning of the Louisiana Constitution. **Chambers,** 595 So.2d at 602.

Whether a "taking" has occurred must first be considered before the question of compensation. **Layne v. City of Mandeville,** 633 So.2d 608, 612 (La. App. 1st Cir. 1993), writ denied, 94-0268 (La. 3/25/94), 635 So.2d 234. In **Chambers,** recognizing that the taking and damaging of property rights is by nature abstract and incompletely understood, the Louisiana Supreme Court adopted a three-pronged test to analyze claims of inverse condemnation under Article I, Section 4 of the Louisiana Constitution. The first prong involves a determination of whether a person's legal right with respect to a thing or an object has been affected; in this part of the analysis, a court must be able to identify a recognized species of private property right that has been affected. Second, if it is determined that property is involved, the court must then decide, whether the property, either a right or a thing, has been taken or damaged in the constitutional sense. The court stressed that if property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question is whether the taking or damaging is for a public purpose under Article I, Section 4. **Chambers,** 595 So.2d at 603.

Louisiana law recognizes that a governmental regulation can constitute a taking under Article I, Section 4 of the Louisiana Constitution. In **Annison v. Hoover,** 517 So.2d 420, 423 (La. App. 1st Cir. 1987), writ denied, 519 So.2d 148 (1988), this court identified a distinction between physical takings of property,

---

[1] By contrast, in order for a taking to be compensable under the Taking Clause of the United States Constitution, it must constitute an actual, permanent invasion of the property, amounting to an appropriation of, and not merely an injury to the property. See Faulk, 172 So.3d at 1044 n. 13.

which are easily identifiable, and regulatory takings of property, which may or may not be easily identifiable. This court also observed that regulatory programs that affect property values may or may not constitute takings. This court held that a taking has occurred if there has been a substantial diminution in value to such an extent there has been a destruction of the major portion of the property's value. **Annison**, 517 So.2d at 423.

In **Faulk**, the Louisiana Supreme Court addressed a certified question from a federal court asking whether the application of a particular statute constituted an unconstitutional taking of private property in violation of Article I, Section 4 of the Louisiana Constitution. **Faulk**, 172 So.3d at 1038. The Supreme Court acknowledged that federal takings jurisprudence may serve as "guideposts" in addressing takings claims under the Louisiana Constitution. **Faulk**, 172 So.3d at 1056 n. 33. The Court observed that federal case law recognizes that compensation may be required under the Federal Constitution when a governmental regulation of private property is so onerous that its effect is tantamount to a direct appropriation or ouster and that a temporary government action may give rise to a taking claim if permanent action of the same character would constitute a taking. **Faulk**, 172 So.3d at 1056-1057. The Supreme Court recognized the difficulty of applying any one approach or test in analyzing takings claims under the Louisiana Constitution, stating:

> [N]o magic formula enables a court to judge, in every case, whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the courts have recognized few invariable rules in this area. Most takings claims turn on situation-specific factual inquiries. Such considerations for determining whether a taking has occurred include: the character of the land at issue; the property owner's distinct investment-backed expectations, a matter often informed by the law in force in the state in which the property is located; and the degree to which the invasion is intended or is the foreseeable result of authorized government action.

13

[Citations Omitted]
**Faulk**, 172 So.3d at 1057.

Under federal takings jurisprudence, it is well established that when a government regulation goes too far, it constitutes a regulatory taking. **Pennsylvania Coal Co. v. Mahon**, 260 U.S. 393, 415 (1922), 43 S.Ct. 158, 67 L.Ed. 322; **Robinson v. City of Baton Rouge**, 13-375 (US. Dist. Ct. M.D. La.), 2015 WL 13522820 at \*8 (unpublished). However, in decades of regulatory takings jurisprudence, federal courts refused to define any set formula for determining "how far is too far." Id. Instead, federal courts engage in ad hoc, factual inquiries based on criteria set forth in **Penn Central Transportation Co. v. City of New York**, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), which are designed to determine when justice and fairness demand that economic injuries caused by public action be compensated by the government rather than remaining disproportionately concentrated on a few persons. In determining whether a regulatory taking has occurred, some of the factors federal courts examine include: (1) the economic impact on the claimant; (2) interference with distinct investment-backed expectations; (3) the character of the government action; and (4) the public interest advanced in support of the governmental action. **Robinson**, 2015 WL 13522820 at \*8. Ultimately, the determination of whether a regulatory taking has occurred will depend largely upon the particular circumstances of each case.[2] Id.

---

[2] **Avenal,** so heavily relied on by the Governor in this case, plainly demonstrates that the question of whether a given governmental action has resulted in a compensable taking or damage claim under the Louisiana Constitution is inherently a fact-specific inquiry. **Avenal** and the cases cited therein demonstrate that in order to determine whether a plaintiff is entitled to eminent domain compensation because private property has been taken or damaged, a court must conduct a full analysis of the facts and circumstances of the case. In **Avenal**, an eight-day jury trial was held on the merits to determine whether the State had taken actions which had taken or damaged the plaintiffs' right to property. After a review of the entire record and applicable law, the Supreme Court found that a coastal restoration project that lowered the salinity of water covering oyster fishermen's leases did not constitute a "taking" under the Louisiana Constitution because a vast majority of the leases at issue contained hold harmless indemnity clauses validly releasing the State from liability as a result of the project. With respect to leases that did not contain hold harmless clauses, the Supreme Court ruled that those fishermen's rights were not "taken" because they had not been denied of all economically beneficial uses of their property, although their rights may have been "damaged" under Article I, Section 4 of the Louisiana Constitution. The court did not further address the damage claim because it found those claims had prescribed.

14

Recently, the Louisiana Supreme Court decreed that "even in a pandemic, the Constitution cannot be put away and forgotten." **State v. Spell**, 2021-00876 (La. 5/13/22), 339 So.3d 1125, 1139 (citing **Roman Catholic Diocese of Brooklyn v. Cuomo**, ___ U.S. ____, 141 S.Ct. 63, 68, 208 L.Ed.2d 206 (2020)(*per curiam*). We conclude that the trial court erred in granting the objection of no cause of action because the Governor's Bar Closure Orders were enacted in response to a public health threat posed by the pandemic. Certainly, the fact that the Governors' Bar Closure Orders were enacted in response to a pandemic is a factor that must be considered by the trial court in examining the character of the governmental action in order to determine whether a compensable taking occurred under all of the facts of this case. However, as Louisiana and federal takings jurisprudence demonstrates, it is only one of many factors that must be considered in evaluating takings claims. Thus, in determining whether the bar owners' property has been taken or damaged in the constitutional sense, a court must consider the economic impact of the Bar Closure Orders on the bar owners. Relevant to this determination is the magnitude or character of the burden the Governor's Bar Closure Orders imposed on private property rights and how the burden was distributed among property owners as a result of those orders. See **Lingle v. Chevron, U.S.A., Inc.**, 544 U.S. 528, 542, 125 S.Ct. 2074, 2084, 161 L.Ed.2d 876 (2005). The takings alleged by the bar owners must be examined in the larger context of the response to the pandemic to determine if the bar owners in this case have actually suffered greater losses than the losses suffered by other citizens and businesses. In a pandemic, all citizens and businesses may be called upon to share the burden of losing their liberties and businesses interests for a period of time for the public good of stopping the spread of a dreaded disease. However, certain individuals or businesses may be called upon to suffer a greater loss for the public good and should, in some cases, be compensated for their

15

greater loss in protecting the health and welfare of the citizens of this State. Further, the defendant and the citizens of the State should be willing to pay those parties who have suffered a greater loss and had to sacrifice more in an attempt to protect the health and safety of all.

On an objection of no cause of action, a court may consider only whether the plaintiff has stated a legally cognizable claim on the face of the petition; it may not evaluate the likelihood that the plaintiff will succeed in establishing the elements of that cause of action. Examining the allegations of the petition, we find that the bar owners have alleged sufficient facts to state cognizable takings claims under Article I, Section 4 of the Louisiana Constitution against the Governor in his official capacity. The bar owners alleged that they had constitutionally protected property rights in lawfully issued alcohol permits and income derived from their business enterprises acting as bars. They further alleged that these rights were taken and damaged by the Governor for the express purpose of protecting the public by removing or reducing a risk to public health or safety, satisfying the "public purpose" prong of the constitutional takings' analysis. Finally, the bar owners alleged that the Governor's Bar Closure Orders constituted regulatory takings and damaged their property rights, and thus, constituted takings in the constitutional sense. As the jurisprudence demonstrates, a court can only determine whether the bar owners can satisfy this prong of the **Chambers** test after all of the facts of this case are developed and those facts are properly analyzed in the context of takings jurisprudence. The trial court erred in finding that the Governor's Bar Closure Orders could not constitute takings in the constitutional sense under any circumstances. Although there may be procedural mechanisms available to the Governor to challenge the

16

efficacy of the bar owners' takings claims, we simply conclude today that an objection of no cause of action was not an appropriate one.[3]

## CONCLUSION

For these foregoing reasons, we reverse the trial court's judgment granting the Governor's peremptory exception raising the objection of no cause of action. We remand the matter to the trial court for proceedings consistent with this opinion. Appeal costs, in the amount of $1,708.00, are assessed to appellee, John Bel Edwards, in his official capacity as the Governor of Louisiana.

**REVERSED AND REMANDED.**

---

[3] Because we have found that the bar owners have stated a cause of action under the Louisiana Constitution, we need not address whether they have alleged facts sufficient to support a statutory cause of action. When the petition sets forth a cause of action, none of the other causes of action may be dismissed on a peremptory exception pleading the objection of no cause of action. **Calloway**, 218 So.3d at 649.